CRESSON v. WORTHAM-CARTER PUB. CO.
(No. 6885.) *

(Court of Civil Appeals of Texas. San Antonio. Jan. 31, 1923. Rehearing Denied March 7, 1923.)

1. **Libel and slander** ⊚⇒49—**No liability for publishing fair, true, and impartial account of privileged report of congressional committee.**

A report of a congressional committee being, under Vernon's Sayles' Ann. Civ. St. 1914, art. 5597, § 2, a privileged communication, publication of a fair, true, and impartial account thereof, though libelous per se, does not render the publisher liable.

2. **Libel and slander** ⊚⇒49—**Newspaper account of report of congressional committee, fair, true, and impartial.**

A newspaper account of the report of the congressional committee to investigate the escape of Bergdoll *held* fair, true, and impartial, including the headlines.

3. **Witnesses** ⊚⇒271(4)—**Permitting reading of excerpts from report before its introduction on cross-examination of plaintiff not improper.**

On cross-examination of plaintiff in libel for publication of an account of a report of a congressional committee, it was not error to permit counsel to read excerpts from the report before its introduction in evidence.

4. **Witnesses** ⊚⇒268(8) — **Cross-examination held proper, in view of testimony on direct.**

Plaintiff in libel having on his direct examination stated that he had read the same article in other papers, permitting him to be cross-examined about the publication in other papers is not error.

5. **Libel and slander** ⊚⇒105(2)—**Plaintiff may not testify to suits against others for like publication.**

Plaintiff in libel may not testify to the history of his suits against other papers for publication of the same article, the status thereof being unimportant.

6. **Libel and slander** ⊚⇒127 — **Judgment for costs in effect for nominal damages.**

Plaintiff in libel in effect recovered nominal damages by judgment in his favor for costs, such damages being but a peg on which to hang costs.

7. **Appeal and error** ⊚⇒1171(1)—**No reversal for failure to award nominal damages.**

Judgment will not be reversed for mere failure to award nominal costs, at least where it awarded costs to the complaining party.

On Motion for Rehearing.

8. **Appeal and error** ⊚⇒971(3)—**Witnesses** ⊚⇒ 267—**Cross-examination is largely in trial judge's discretion.**

The matter of cross-examination is largely in the trial judge's discretion; and his rulings will not be disturbed, if not arbitrarily and unreasonably made.

9. **Witnesses** ⊚⇒269(1) — **Cross-examination not confined to questions on direct.**

In Texas a witness may be cross-examined in regard to questions not asked and answered on the examination in chief.

10. **Appeal and error** ⊚⇒690(4), 692(1)—**Bill of exceptions must show evidence.**

For review of ruling on evidence, the bill of exceptions must show the evidence admitted or excluded and its materiality.

11. **Libel and slander** ⊚⇒105(1) — **Belief of news agency and retraction by others immaterial on construction of report.**

Relative to whether the account published by defendant of the report of a congressional investigating committee was fair, true, and impartial, the fact that a news agency did not believe the report charged plaintiff with conspiracy, and that other newspapers retracted and apologized, is immaterial.

Error from District Court, Bexar County; Robt. W. B. Terrell, Judge.

Action by Charles C. Cresson against the Wortham-Carter Publishing Company. Judgment for defendant, and plaintiff brings error. Affirmed.

J. D. Dodson and Hicks, Hicks, Dickson & Bobbitt, all of San Antonio, for plaintiff in error.

Samuels & Brown, of Fort Worth, and Ball & Seeligson, of San Antonio, for defendant in error.

FLY, C. J. Plaintiff in error, referred to as plaintiff here, sued defendant in error, called defendant herein, for damages alleged to have been sustained by him from the publication of a certain article in the Fort Worth Star-Telegram, a newspaper published in the city of Fort Worth, Tex., which purported to be an account of a report of a certain committee appointed by the House of Representatives of the American Congress to investigate the escape of the notorious and skulking evader of the draft of young men for the army on May 20, 1920. The cause was submitted to a jury on special issues and on the answers thereto judgment was rendered that appellant be denied a recovery but that the costs be taxed against appellee.

The jury found that the article published by appellee was not a fair, true, and impartial account of the majority report of the congressional committee concerning the Bergdoll investigation, and that no actual or exemplary damages should be awarded appellant. The facts show that a committee was appointed to investigate the circumstances surrounding the escape of Bergdoll from custody, after he had been convicted by a court martial of being an evader of the draft, and the committee made both a majority and minority report to Congress, and the article published in the Fort Worth Star-Telegram purported to be a synopsis or condensation of

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 25, 1923.

the committee report. The article, which came from the International News Service at Washington, D. C., a corporation serving a number of American newspapers, was preceded by headlines as follows:

"Three Accused of Bergdoll Escape Plot, High Officers of Army Aided Flight, Charge of Probers."

The article stated that Grover Cleveland Bergdoll, the notorious Philadelphia draft dodger, made his escape from military authorities on May 20, 1920, while searching for a "pot of gold" in Maryland mountains, "through the misdoing of somebody other than the Bergdoll family and their immediate association"; that "Brigadier General Ansell, former assistant judge advocate general of the army, Col. John E. Hunt, former commandant of the United States disciplinary barracks at Governor's Island, New York, and now retired, and Col. C. C. Cresson, prosecuting judge advocate, are charged in the report with being infinitely more culpable than the rest." The article gives the names of the majority as well as of the minority, who made the two reports, stating that the minority found that only friends and relatives of Bergdoll participated in obtaining his escape and that no person connected with the army or disciplinary barracks received, "any bribe or was approached with a view of bribery in connection with this escape." The article further stated that the report recommended that General Ansell be barred from practice before any government department or court martial and federal civil courts—"above safety and integrity he has placed gold"; that Col. Hunt had been promoted and retired on the pay of $3,600 a year, and the committee said that "an outraged nation has the right to demand that Col. Hunt's annuity be discontinued." Others are mentioned in the report according to the article, and then the report says the activities were transferred from Governor's Island to Washington and the transfer was so absolute that an official letter sent from Philadelphia to Washington forecasting Bergdoll's escape within two weeks was pigeonholed. The article quotes from the report:

"We see the commandant of the prison turn deaf, dumb, and blind in every direction that might hinder Bergdoll's escape. Finally, and as a fitting signal to this sordid tale, we find the derelict commandant of Governor's Island was prosecuted by one whose shame was measured by his days. Following the flimsy pretense —only a pretense—at prosecution, the commandant's fate was given to a court composed of military officers, who found him not guilty."

The article further quotes from the report that Colonel Cresson, the prosecuting judge advocate speaking of Colonel Hunt—

"gave notice that he would not, if he could, prove that he did not furnish a sufficient guard if he was bribed not to do so."

The article further quotes from the majority report:

"The inevitable conclusion is that Bergdoll bought his way out; yet Colonel Cresson, the prosecutor, boldly announced that he would not prove that to be the case, even if he could. Prisoners in making escapes use different instruments. Some use crowbars, some files, some saws, and some false keys. The instrument used by Bergdoll was money."

The article quotes the minority report as saying that Hunt was guilty of "grave dereliction of duty," in not having a commissioned officer with the prisoner and that the acquittal of Hunt was a "serious reflection upon the court martial system," and that there appeared to be "a certain lack of efficiency in the efforts of various government agencies to apprehend Bergdoll after his escape, and a lack of co-operation and coordination between the war department and the department of justice." In the article was a statement that Earl B. Wood, in the department of justice, should be dismissed from the service of the government for suppressing testimony.

A comparison of the article, alleged to contain the libelous matter with the committee report shows that the newspaper was not near so intense in the report of the committee's report as was that creation, and that several strong charges made by the committee in the report were not embodied in the newspaper account of it. The newspaper said that Ansell, Hunt, and Cresson had been charged with being infinitely more culpable than the rest, and there seems to be strong foundation for that conclusion from the report that:

"While there are many who participated in the conspiracy leading to Bergdoll's escape and the acquittal of those who brought it about, there are three who are infinitely more culpable than the rest. Those three are Gen. Ansell, Col. Hunt, and Col. C. C. Cresson."

The newspaper report used almost the identical language of the committee report. All through the committee report the escape and the acquittal are bound together as forming parts of the same conspiracy. The escape was charged to have been brought about by the use of gold, and it was the evident intent of the committee to show that the conspiracy, begun before the escape of the prisoner, culminated in the trial and acquittal of the commandant of the military barracks at Governor's Island. A brief review of the report of the committee will lead to this conclusion.

The report begins by giving the authority for, and the appointment of, five members of Congress to make an investigation of the "plot and conspiracy" that existed "among and between divers and sundry persons unknown to consummate the escape of said Bergdoll from confinement under his said sentence." The committee was given full au-

thority to procure all facts, not only as to the friends, relatives, and attorneys of Bergdoll being connected with the conspiracy, but also as to whether officers, noncommissioned officers, or privates of the army, or with the administration of the said disciplinary barracks or any other person participated in a plot or conspiracy to effect or give aid to said escape, etc. The committee gave a history of the traitorous conduct of Bergdoll, of his arrest and conviction, and of his detention on one pretext or another in the disciplinary barracks instead of being sent to Ft. Leavenworth, Kan., to begin serving his five years term in the penitentiary.

On May 20, 1920, he was permitted to leave the prison at Governor's Island, accompanied by two sergeants as a guard, for the purpose of going into the mountains of Western Maryland and to secure over $100,000, which he claimed to have buried there. When they reached Philadelphia he escaped, went to Canada, from there to London and thence to Paris and Germany. Shortly after his confinement on Governor's Island, efforts were made to have him released on the ground of his insanity, but he was declared to be of sound mind. Next efforts were made to release him by writ of habeas corpus, but they failed. The committee found that he then sought other means of escape, all these matters being mentioned to show the conspiracy, and it was found that the cunning of a man named Gibboney, the influence of Judge Wescott with the administration of Ansell's standing with the army were combined in one general scheme of defense or escape for Bergdoll. Out of the combination grew the "pot of gold" scheme which resulted in Bergdoll's escape. Ansell placed the matter of the "pot of gold' before Adjutant General Harris and used the names of Gibboney and Judge Wescott, former Attorney General of New Jersey, to forward the scheme. He pledged the adjutant general that he would see that the prisoner did not escape. He did escape. Hunt refused to handcuff him, although he had been warned by his superior officers that Bergdoll was a dangerous man, and when he left the walls should be handcuffed to one sentinel and guarded by another. Hunt said he relied upon his psychiatrist rather than his superior officers. After going into all the details of the escape, and the culpability of Ansell, Hunt and others, the committee said:

"In the natural sequence of things the conduct of O'Hare (one of the guards on the gold hunt) should next be considered, but, as the conduct and trial of Col. Hunt are in such close intimacy with Col. C. C. Cresson, the judge advocate who prosecuted—or rather who was selected or detailed to prosecute Col. Hunt—it is deemed best that his acts and omissions should be considered at this point in the report. As ugly as are many phases of this whole matter, none is more defenseless than the conduct of Col. Cresson in his pretended prosecution of Col. Hunt. To turn those loose who turned Bergdoll loose but adds insult to injury, and Col. Cresson was the principal one of the instruments through which this latter offense was perpetrated."

Charges were preferred against Col. Hunt for a failure to perform his duty in guarding and preventing the escape of Bergdoll. There were five specifications in the charges, and, although he pleaded guilty to three of them and was shown to be guilty of the other two, he was acquitted, Col. Cresson being the prosecutor. The report finds that before any testimony was introduced Cresson said to the court:

"The government disclaims, and personally and on behalf of the prosecution, any idea of there being anything crooked or any collusion on the part of Col. Hunt in this matter, or that any money was used, the only charge being simply neglect of duty and failure to take due precaution in the matter."

The report continues:

"By that declaration Col. Cresson gave notice that he would not, if he could, prove that he did not furnish a sufficient guard if he was bribed to do so. In the same way this prosecuting attorney served notice that he would not prove, even if he would do so, that Col. Hunt had failed to send a commissioned officer along with the guard if he had been paid not to do so. The inevitable conclusion is that Bergdoll bought his way out; yet Col. Cresson, the prosecutor, boldly announced that he would not prove that to be the case even if he could. That statement by Col. Cresson clearly shows what a shocking mockery the rest of the trial was."

The report further attempted to show that appellant permitted testimony that was clearly illegal to be introduced for the defense, although objections had been sustained to it, and he himself brought out testimony favoring Col. Hunt, and endeavored to conceal material testimony, and attempted to give a good character to witnesses for the defense who were unknown to him before the trial. Again the report said the prosecutor stated that no testimony of the competency of the guard was necessary, as there was no charge that the sergeants were improper men or not good sergeants, although it was charged that Col. Hunt had permitted "Bergdoll to leave said barracks on the date aforesaid, not properly and suitably guarded." Again quotations were made from the concluding speech of the prosecutor in which he testified to the high character of Col. Hunt. The report continues:

"Just here it should be emphasized again that the prosecuting judge advocate, Col. Cresson, declared in the court martial that he would not prove that Col. Hunt corruptly refused the handcuffs, or corruptly failed to send a commissioned officer with the expedition, or corruptly failed to have one of the counsel accompany it, or corruptly failed to provide a sufficient guard, even if he could do so. Col. Cresson's con-

tention during the trial was that Hunt was guilty—but only of a technical offense—if he, without taking a bribe, disobeyed orders; but that if he disobeyed orders, because he was bribed so to do, then he was not guilty."

The report discusses the evidence as showing that the prisoner was held at Governor's Island with the design to open a chance for escape, he was allowed to use money lavishly on those about him, that he remained there at the request of Ansell, who then obtained leave for the prisoner to go in quest of buried treasure. All the facts were collated as tending to show a long drawn out conspiracy to release the prisoner and permit him to avoid the sentence of imprisonment in the penitentiary. Then, after summing up the facts of the conspiracy, the conclusion is reached by the committee that:

"While there are many who participated in the conspiracy leading to Bergdoll's escape and the acquittal of those who brought it about, there are those who are infinitely more culpable than the rest. Those three are Gen. Ansell, Col. Hunt, and Col. C. C. Cresson."

What was the conspiracy towards which the whole report was aimed? The report does not leave that open to surmise or guess, but states that it was "the conspiracy leading to Bergdoll's escape and the acquittal of those who brought it about," and in order that there be no mistake about those charged with the conspiracy the report names the conspirators "infinitely more culpable than the rest." The report sums up the evidence as follows:

"At first only long and meagerly defined shadows, reaching from the 'cause,' were cast across the nation's integrity; but as the rays of discernment and analysis rose higher and higher, the shadows shortened until a black spot stands and will forever stand, exposed to the light of reason, although none but the guilty may have seen the corrupting influence pass from slacker to traitor.

"But, with the advent into the case of him who, by his partner, has been modestly declared to be 'the highest authority in this country on military law,' we find a sorcererlike deception practiced upon the trusting. Next we see a palsied old man, overflowing with that generous spirit of acquiescence and lack of resistance that always accompanies those who grow old beautifully, placed and replaced in artistlike fashion, wherever his name could best be commercialized.

"Then we find the activities transferred from Washington, which for the then present must be obscured, to Governor's Island. This transfer from Washington to Governor's Island was so absolute that even an official letter of warning sent from Philadelphia to Washington forecasting Bergdoll's escape within two weeks, was hidden away in a pigeonhole, never to find its way to Bergdoll's prison, that he might be properly guarded.

"Then we find Bergdoll put into the same cell with a prisoner who is permitted to make almost daily visits to New York, bearing on one occasion, if not on others, a written message to a well-known leader in America against constituted government. Also we find a large sum of money placed at the prison, obviously that Bergdoll might purchase the good will, and perhaps, the silence, of guards or the assistance of fellow prisoners.

"Next we see the commandant of the prison turn deaf, dumb, and blind to every direction that might hinder Bergdoll's escape. We see handcuffs denied, and every other official instruction violated. The plighted faith of counsel absconds before the prisoner does, that his going may be the easier. Finally, and as a fitting sequel to this sordid tale, we find that the derelict commandant at Governor's Island was prosecuted by one whose shame should be measured only by his days. Following the flimsy pretense—only a pretense—at prosecution, the commandant's fate was given to a court composed of military officers, who found him "not guilty" in the face of his own admissions that he had not complied with instructions for the violation of which he was then being tried.

"Bergdoll escaped through the misdoing of somebody other than the Bergdoll family and their immediate, personal associates such as Romig, Stecker, Gibboney, and Mrs. Bergdoll. It is hoped that this report bares to the Congress the others who are more guilty than even the Bergdoll family. Shall they go unwhipped of justice?

"The mother, the brother, the foster father—only those who gave shelter and comfort out of love for the black sheep of the family—have been convicted. Shall those who, for money, conceived, connived at, and executed the escape, continue to practice in our nation's courts, to wear the uniform of an officer of our army or to collect an annuity from a wronged people?"

Again three men are mentioned, and they are described so that there can be no doubt as to whom is meant. One practices in the Nation's courts, one wears the uniform of an officer in the army, and the other collects an annuity from a wronged people. They are the three, accurately described in another part of the report as the three most culpable conspirators, whose names and titles are given.

In the light of that report the newspaper would be justified in using the headlines:

"Three Accused of Bergdoll Escape Plot, High Officers of Army Aided Flight, Charge of Probers."

Does not the report accuse three men of escape plot? And does it not charge that high officers of the army aided the flight of Bergdoll? It does in strong and unspeakable terms make such accusation and charge, and names the men so charged and gives their official titles in the American army. There is no assertion or inference in the article printed in the newspaper that is not sustained, by the terms of the report to the Congress.

The plans for the escape of Bergdoll were alleged to have grown out of a conspiracy formed to obtain money from the Bergdolls,

who were wealthy, and the acquittal of Hunt was charged to have been a part of that conspiracy. This is apparent from that part of the report defining and applying the law of conspiracy. Says the report:

"It is not necessary to constitute a conspiracy that two or more persons should meet together and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme is to be, and the details of the plan, or means by which the unlawful combination is to be made effective. When two or more persons pursue by their acts the same object, often by the same means, one performing one part of the act and the other another part of the act, so as to complete it, with a view to the attaining of the object which they were pursuing, this will be sufficient to constitute conspiracy. Concurrence of sentiment and co-operative conduct in an unlawful and criminal enterprise and not formality of speech are the essential ingredients of a criminal conspiracy. Previous acquaintance is unnecessary, and it is not essential that each conspirator should know the exact part to be performed by the other conspirator in execution of the conspiracy. Moreover, all the conspirators need not enter into the agreement at the same time. When a new party, with knowledge of the facts, concurs in the plans of the original conspirators, and comes in to aid in the execution of them, he is from that moment a coconspirator."

This statement of the law could have had but one purpose and that to show that a dramatic conspiracy had been conceived and executed by the three "infinitely more culpable than the rest," the man practicing in "our nation's courts," the man collecting "an annuity from a wronged people" and the man who wears "the uniform of an officer of our army." There was but one practicing in the courts, but one wearing the uniform and but one drawing an annuity, and they were fully identified by the report. They were named, and were Ansell, the practicing attorney, Cresson, the wearer of the uniform, and Hunt, the recipient of the annuity. This is the reasonable interpretation of the report, which was followed by the publication in the newspapers, and for which interpretation it should not be held liable.

[1] The report of the committee was admittedly a privileged communication under section 2, art. 5597, Vernon's Sayles' Civ. Stats. and the general law on the subject. If the account of the report of the committee was fair, true, and impartial, it would not subject defendant to damages, although the account may have been libelous per se. No fair, true, and impartial account of the report of the congressional committee could have been other than libelous, no matter how fair, true, and impartial it may have been, but, being an account of a privileged legislative report, its fairness, truth, and impartiality protected its publisher from liability for damages.

[2] All of the evidence in this case tended to show that the account of the report of the committee to Congress was fair, true, and impartial, including the headlines, and the court could with propriety have instructed the jury to have returned a verdict in favor of defendant. The evidence was all written, so far as it had any bearing on the issues, and this court is in a position to pass upon it at least as well as a jury.

The exceptions to the answer were without merit and were properly overruled, and this ruling disposes of the first six and the sixteenth assignments of error.

[3-5] When plaintiff took the stand as a witness, the counsel for appellee had the right to cross-examine him according to their own methods, as long as such cross-examination remained within the bounds of propriety and reason, and no such rule was violated by permitting counsel to read excerpts from the committee report, before the latter had been introduced in evidence. The full report was afterwards placed in evidence without objection. Nor did the court err in permitting plaintiff to be cross-examined about the publication of the article in other newspapers, because in direct examination he had stated that he had read the same article in other papers and that it had been communicated to him by the International News Agency and the Associated Press. The status of plaintiff's other suits against newspapers was a matter of no importance to court or jury, and the court properly denied him the privilege of going into a history of such suits.

The tenth, eleventh and twelfth assignments of error are overruled there being no basis for them in the law or evidence.

[6, 7] The jury, under the evidence, could properly say that no damages had been suffered by the plaintiff from the publication of the article, although it may have been thought by them that the account of the report was not fair, true, and impartial. If it be held that the published account, being libelous per se, plaintiff was entitled to nominal damages, then it may be stated that he in effect recovered for nominal damages, which might have been one cent, by reason of the fact that judgment was rendered in his favor for costs of the suit. If it was error for the jury not to find in favor of plaintiff for nominal damages, after stating that the publication was not fair, true, and impartial, still a judgment will not be reversed merely on account of a failure to award nominal damages. Sutherland Damages, § 11, and numerous authorities cited in footnote No. 25, among the number being the cases of Northcutt v. Hume (Tex. Civ. App.) 174 S. W. 974, and Major v. Hefley Coleman Co. (Tex. Civ. App.) 164 S. W. 445. The rule announced would be intensified where a judgment for costs had been rendered against the

defendant, for, as said by the Supreme Court of Connecticut in Stanton v. Railway, 59 Conn. 272, 22 Atl. 300, 21 Am. St. Rep. 110:

"Nominal damages mean no damages at all. * * * In the quaint language of an old writer they are 'a mere peg to hang costs on.'"

The "peg" was found in this case on which to hang the costs in the lower court. As said in the Major v. Hefley Case, herein cited:

"In such a case, at most, the plaintiff would be entitled to nominal damages, and, since appellants recovered their costs in the court below, the cause would not be remanded to enable them to recover nominal damages."

Plaintiff alleged that by "charge of probers" was meant the congressional committee and the editor of the paper so testified. All of the assignments of error are overruled.

As to the truth or falsity of the charges made in the report of the committee against Gen. Ansell, Col. Cresson, and Col. Hunt, this court is not concerned, and is in no position to pass upon the truth of the same, if it so desired, and it has reviewed the report and brought out the charges against plaintiff because it was necessary, in order to determine the truth of the deductions drawn from it by defendant. The committee report is a privileged document, and newspapers and periodicals have the right to indulge in conclusions based thereon, provided they are fair, true, and impartial, and, under our view, the report justified the account in the newspaper.

The judgment is affirmed.

### On Motion for Rehearing.

[8] There is no conflict between the cause and that of Galveston Tribune v. Johnson (Tex. Civ. App.) 141 S. W. 302, nor against that "unbroken line of authorities in other states." Where is that "unbroken line of authorities?" The Tribune v. Johnson has no question at all similar to the one presented in this case. In the cited case it was held that the publication could not be justified on the ground that it had been published in other papers. We agree with that ruling, and nothing to the contrary can be found in the opinion of this court. We still hold, however, that, when plaintiff injected the information into his testimony that other papers had published the same article, defendant was authorized to cross-examine plaintiff. It is now contended that plaintiff did not so testify on his direct examination. It is also stated that "it is undisputed that the account sent out by the Associated Press was not libelous," and if that be true then it was not libelous when published by defendant, for plaintiff, in his direct evidence when testifying for himself, stated that he saw the identical article published by defendant, headlines

and all "before it got into the papers." In order that there might be no mistake as to the article he saw beforehand, it was copied verbatim et literatim into his testimony, and he said: "I saw the following article before August 18, 1921, I saw it before it got into the papers." Then after a copy of the article he reiterates: "I saw the above article in Omaha. It was communicated to me by representatives of both the International News Agency and the Associated Press." He also swore in connection with the publication of the article by defendant. "It was brought to my attention first—that was in August, that paper and other papers—I got all of my Texas papers." What article was he referring to? None other than the one shown him by the Associated Press Agency "before it got into the papers." Was not that testifying that the article published by defendant was the same one shown plaintiff, "before it got into the papers," the same one published by the papers?

[9] The American rule, as generally understood and applied, permits the investigation, on cross-examination, not only of the specific matter of the examination in chief, but extends it to the general subject thereof. The American rule permits cross-examination which tends to discredit or impeach the witness, or to show his interest, prejudice, or motives, or to test his accuracy. Elliott Ev. §§ 920–925, 926, and long list of authorities cited in footnotes. The matter of cross-examination is left largely to the discretion of the trial judge, and his ruling will not be disturbed, if not arbitrarily and unreasonably made. As said by the great author Greenleaf:

"The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests, which the law has devised for the discovery of truth. By means of it, the situation of the witness with respect to the parties, and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description, are all fully ascertained and submitted to the consideration of the jury, before whom he has testified, and who have thus had an opportunity of observing his demeanor and of determining the just weight and value of his testimony."

If that be the rule as to the ordinary witness, with what intensity does it apply to the testimony of a plaintiff who is testifying in his own behalf. In this instance the plaintiff had told how he was "all broken up" over the publication, how "ashamed to go out on the street and meet people." He sought appeal to the emotions of the jury by stating: "I thought of my mother and my wife, and knew that they would be held up to scorn—my

old mother down in Texas." It cannot be said that the trial judge acted oppressively and arbitrarily in permitting defendant to show by plaintiff on cross-examination that he had broadcasted the Union with suits against newspapers for damages in connection with the same article as a vindication of his wounded honor, and as a balm for his intense sorrow and humiliation. The evidence was not to justify the publication by defendant, but to show that along with his sorrow and mortification plaintiff was putting money in his purse.

While the American rule is as herein before stated, in Texas the rule is broader and more comprehensive, and a witness can be cross-examined in regard to questions not asked and answered on the examination in chief. Wentworth v. Crawford, 11 Tex. 127; Rhine v. Blake, 59 Tex. 240; Evansich v. Railway, 61 Tex. 24. As said in the Wentworth v. Crawford Case:

"We are aware that some dicta are to be found, from respectable names, that the cross-examination must be confined to the questions propounded and answered on the examination in chief; but this is not believed to be the established doctrine on the subject. We believe that it is regular to ask a witness, on a cross-examination, any question that may be pertinent to the questions to be decided by the jury; and that any fact, to show a bias on the evidence of the opposite party, is admissible, whether the same be offered by the examination in chief or cross-examination."

[10] The whole of this discussion of the admissibility of evidence could, and doubtless should, have been omitted, for the reason that the bill of exceptions does not indicate what the answers of the plaintiff were to the questions objected to, and consequently fail to show that plaintiff was injured by the answers, even though the questions were not permissible. Plaintiff may not have answered anything that could have had any injurious effect. Where error is assigned to the admission or exclusion of evidence, the evidence must be set out and its materiality shown. Whitaker v. Gee, 61 Tex. 217; Herring v. Mason, 17 Tex. Civ. App. 559, 43 S. W, 797; Railway v. Stoker (Tex. Civ. App.) 142 S. W. 972; Bank v. Cameron (Tex. Civ. App.) 203 S. W. 1167; Willard v. Knoblauch (Tex. Civ. App.) 206 S. W. 734.

There is no conflict in the opinion of this court on any point raised in this case with any Texas case, although it is asserted positively that the opinion clashes with some half a dozen decisions of the Courts of Civil Appeals and several Supreme Court decisions. Wherein the conflict arises is not pointed out.

[11] There is no weight to be attached to the fact that the Associated Press did not believe the report charged plaintiff with conspiracy, or that newspapers under the fear of claims for damages retracted and apologized. They know what it usually means to go before a jury on a charge of libel. It is on the order of testimony extracted from accused persons by detectives and prosecutors. This court may undoubtedly be correct in its construction of the congressional report, although every press agency and newspaper may, under fear of prosecution, have retracted and published such retractions as plaintiff may have demanded. Their retractions, while advanced as authority by plaintiff, cannot be so taken by this court.

It does not seem to occur to plaintiff in his motion for a rehearing that it was not necessary for plaintiff to have been actively engaged in the conspiracy to allow Bergdoll to escape, in order to become a conspirator after that escape which involved him in the whole conspiracy. It is admitted that the report charged plaintiff to be a party to the conspiracy to acquit Hunt. If he was, he became a party to the whole conspiracy, from its inception to its culmination. To again quote from the congressional report:

"Moreover, all the conspirators need not enter into the agreement at the same time. When a new party, with knowledge of the facts, concurs in the plans of the original conspirators, and comes in to aid in the execution of them, he is from that moment a conspirator."

When using the quoted language, to whom was the report referring? It could not have referred to Ansell and Hunt, because they were shown to be the original offenders, and must necessarily have referred to the only other man connected with the affair in a leading role, who was the plaintiff in this case. If he conspired to assist in thwarting justice by failing and refusing to prosecute Hunt as he should have done, he became a conspirator in the whole infamous scheme of releasing Bergdoll, and then releasing the active agents of such escape before a court martial. Oliver v. Huckins (Tex. Civ. App.) 244 S. W. 625.

The motion is overruled.