## CRESSON v. DISPATCH PRINTING CO.

(District Court, D. Minnesota, Third Division. June 11, 1923.)

1. **Libel and slander** ⊜⇒42(2)—**Qualified privilege in reporting and commenting on official proceedings.**

   Newspaper accounts of and comments on the report of a committee of Congress are privileged, provided the account is substantially accurate and the comments fair and they are not published with actual malice.

2. **Libel and salnder** ⊜⇒42(2)—**Published account of the report of a majority of a congressional committee held not libelous.**

   An account published by defendant in its newspaper, giving a summary of the report of a majority of a committee of Congress, stating that it charged plaintiff and others with conspiracy in connection with the escape of Bergdoll, convicted draft evader, *held* to have fairly and accurately stated the substance of the report, and to have gone no further than the report warranted, and in the absence of actual malice to be protected by the qualified privilege.

At Law. Action by Charles C. Cresson against the Dispatch Printing Company. On motion by defendant for judgment on the pleadings. Motion granted.

The above entitled cause came regularly on for hearing upon a motion made by the defendant for judgment on the pleadings and upon a stipulation as to certain facts.

Moore, Oppenheimer, Peterson & Dickson, of St. Paul, Minn., for the motion.

Clarence T. Lowell, of Minneapolis, Minn., and Col. Charles C. Cresson, of Ft. Sam Houston, Tex., opposed.

BOOTH, District Judge. The discussion on this motion has taken wide range, but the vital questions involved are few in number. It is not disputed that the report of the special committee of the House of Representatives was itself an absolutely privileged communication, and this is true, even though it contained false statements charging plaintiff with crime, and even though the statements were made with malice.

[1] It cannot be disputed that newspaper accounts of the report and comments thereon may have a qualified or conditional privilege. The conditions are (1) that the accounts and comments be fair and substantially accurate; (2) that they be not published with actual malice. Tawney v. Simonson Co., 109 Minn. 341, 124 N. W. 229, 27 L. R. A. (N. S.) 1035; Fullerton v. Thompson, 123 Minn. 136, 143 N. W. 260. In the latter case the court said:

"In order to justify as a privileged publication of an official report, the proof must show that the pretended publication of the report is true in substance. If a garbled report is published, or the facts therein contained are perverted, so as to convey the meaning that an official therein referred to had committed a crime, or had been guilty of misconduct, when no such meaning could fairly be drawn from the report, justification is not made out, and the occasion of privilege fails."

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The complaint in the present suit alleges actual malice on the part of the defendant, but the stipulation expressly negatives this; so that the question of actual malice need not further be discussed.

[2] There remains the inquiry as to the other condition; that is, whether the newspaper résumé of the report and the comments thereon were fair and substantially accurate. If they were, then they were privileged; otherwise not. The complaint specified the particulars in which it is claimed the newspaper article failed to fulfill the above condition. It alleges certain headlines to the article as follows:

"House Solons Find Ansell Planned Bergdoll Escape."

"Former General Branded as Master Mind in Getaway by Committee Majority."

"Hunt and Cresson Named Partners in Conspiracy."

And the following excerpt from the article:

"Samuel Tilden Ansell, former Acting Judge Advocate General of the Army, and of the prisoner's legal counsel, Colonel John E. Hunt and Colonel C. C. Cresson, were charged with conspiracy in connection with the escape of Grover Cleveland Bergdoll, the draft evader, in a report signed by three of the five members of a special investigating committee, filed to-day with the House."

The complaint also alleges that all such statements in reference to the plaintiff were false and untrue. The inquiry reduces itself, therefore, to this: Did the report of the committee charge plaintiff with conspiracy in connection with the escape of Bergdoll? It must be borne in mind that the truth or falsity of such a charge against the plaintiff is not here under investigation. Defendant is not sued for making false charges itself against the plaintiff; it is sued for falsely stating that the report of the committee charged plaintiff with the conspiracy. An examination of the report becomes necessary, to ascertain whether plaintiff was charged therein with conspiracy in connection with the escape of Bergdoll.

By the resolution of appointment, the committee was empowered to investigate, among other things:

"Whether relatives, friends, counsel, or attorneys of the said Bergdoll participated in a plot or conspiracy to effect or give aid to said escape or to prevent recapture, or whether officers, noncommissioned officers, or privates of the said disciplinary barracks or any other person participated in a plot or conspiracy to effect or give aid to said escape or to prevent recapture, or were derelict in the performance of any duty devolved or devolving upon them which contributed to making said escape possible or prevented or hindered recapture or made it more easy for the said Bergdoll to elude recapture."

It will be observed that the scope of the inquiry was broad, yet it was confined, generally speaking, to the escape of Bergdoll, but included incidentally matters leading up to the escape and those following the escape, but connected therewith. It must be assumed that the committee performed its duty, and confined its investigation to those matters. When I speak of the committee and its report, I mean the majority of the committee and their report. The report starts with a short statement of what the case under investigation was. It then proceeds to give a narrative of the events leading up to the es-

cape, as developed from the testimony, together with running comments as to certain persons, among them, Ansell, Harris, Westcott, Gibboney, Romig, Hunt, York, and O'Hare. Before taking up O'Hare at length, the report states (page 22):

"In the natural sequence of things, the conduct of O'Hare should next be considered; but, as the conduct and trial of Col. Hunt are in such close intimacy with Col. O. O. Cresson, the judge advocate who prosecuted—or rather who was selected or detailed to prosecute—Col. Hunt, it is deemed best that his acts and omissions should be considered at this point in the report.

"As ugly as are many phases of this whole matter, none is more defenseless than the conduct of Col. Cresson in his pretended prosecution of Col. Hunt.

"To turn those loose who turned Bergdoll loose but adds insult to injury, and Col. Cresson was the principal one of the instruments through which this latter offense was perpetrated."

It is thus seen that Col. Cresson and his acts and omissions were taken up by the committee for discussion while they were still discussing the escape of Bergdoll. The report goes into a long analysis of the trial of Hunt and the conduct of Col. Cresson as judge advocate, including certain statements made by him in the course of the trial, among them (page 25):

"The government disclaims, and personally and on behalf of the prosecution, any idea of there being anything crooked or any collusion on the part of Col. Hunt in this matter, or that any money was used, the only charge in the matter being simply neglect of duty and failure to take due precautions in the matter." Page 7, Hunt's court-martial trial record.

The committee considered the record made at the court-martial of Hunt and said (page 31):

"Whatever of criticism of Col. Cresson there is in this report has been gotten entirely from that record, his speech included. On Page 30 of that record, Col. Cresson, prosecuting, said in his concluding speech:

"'As I stated in the opening of this case, I want to state again that the prosecution does not for a minute think, nor does it intimate, nor does it care to have any one think of intimating, that Col. Hunt in any way wanted Bergdoll to escape, that he colluded in the matter or was in any way in any conspiracy.'"

And again (page 31) the report proceeds:

"Just here it should be emphasized again that the prosecuting judge advocate, Col. Cresson, declared in the court-martial trial that he would not prove that Col. Hunt corruptly refused the handcuffs, or corruptly failed to send a commissioned officer with the expedition, or corruptly failed to have one of the counsel accompany it, or corruptly failed to properly instruct the guard, or corruptly failed to provide a sufficient guard, even if he could do so."

And on page 33:

"While there are many who participated in the conspiracy leading to Bergdoll's escape and the acquittal of those who brought it about, there are three who are infinitely more culpable than the rest. Those three are Gen. Ansell, Col. Hunt, and Col. O. O. Cresson."

Leaving Col. Cresson for the time being, the report takes up the conduct of Earl B. Wood prior to the escape of Bergdoll, which the committee conclude contributed to the escape. Next the report discusses the nature of a conspiracy, and among other things relative thereto states (page 35):

"When a new party with knowledge of the facts concurs in the plans of the original conspirators, and comes in to aid in the execution of them, he is from that moment a co-conspirator."

The report then, in somewhat florid language, traces the steps of the alleged conspiracy, and finally uses this language (page 36):

"Next we see the commandant of the prison turn deaf, dumb, and blind to every direction that might hinder Bergdoll's escape. We see handcuffs denied, and every other official instruction violated. The plighted faith of counsel absconds before the prisoner does, that his going may be easier. Finally, and as a fitting sequel to this sordid tale, we find that the derelict commandant at Governor's Island was prosecuted by one whose shame should be measured only by his days."

And again (page 37):

"Shall those who, for money, conceived, connived at, and executed the escape, continue to practice in our nation's courts, to wear the uniform of an officer of our army, or to collect an annuity from a wronged people?"

In my judgment, this last quotation refers to the same three persons as are mentioned in the extract above given from page 33. The foregoing extracts from the report are but a very small part of the 41 pages of the majority report, and these extracts are given as illustrative of the method of the report, and also as indicative of the conclusions of the majority of the committee.

This court is not required upon this hearing to pass upon the correctness of the conclusions of the committee, either as to law or fact. It is required merely to answer the question whether the report of that committee can fairly be said to charge plaintiff, Cresson, with conspiracy in connection with the escape of Bergdoll. I think the answer must be in the affirmative. It is clear to my mind, from a careful reading of the report, that the committee considered that there was a plot, or conspiracy, widespread and long-continued, which started with the plans for the escape of Bergdoll, and which did not end until after the acquittal of Hunt, at least. The committee considered the objects of the conspiracy to be the safe escape of Bergdoll and freedom from punishment of the conspirators. Unless these were their views, the investigation of Col. Cresson's conduct would be beyond the scope of the resolution, and criticism of him would be without point.

The committee considered that all who took part in effecting either of these objects were in the conspiracy—some of them from the beginning, others coming in later. This explains the linking of Ansell, Hunt, and Cresson in the report. I repeat, this court is not concerned with the correctness of the committee's conceptions, but only with the meaning of their report. My conclusion is that the report does charge plaintiff, Cresson, with conspiracy in connection with the escape of Bergdoll, but does not charge Cresson with directly aiding the escape. In my opinion, no other conclusion can be fairly reached from a consideration of the report as a whole.

The newspaper account complained of goes no further than the report. It states that the report charged Col. Cresson with conspiracy in connection with the escape of Bergdoll, but does not state that he

was charged with directly aiding in the escape. The newspaper account fairly and accurately reflects the report, and is therefore protected by the qualified privilege.

A similar result has been reached in Cresson v. Wortham-Carter Co. (Tex. Civ. App.) 248 S. W. 1077, and in Cresson v. Louisville Courier-Journal, in the Federal District Court for the Western District of Kentucky, February-March, 1923 (no opinion delivered).