**Frank PAPE, Plaintiff-Appellant,**

v.

**TIME, INCORPORATED, Defendant-Appellee.**

**No. 13819.**

United States Court of Appeals
Seventh Circuit.

April 25, 1963.

Rehearing Denied June 14, 1963.

Roger Q. White, Luis Kutner, White, Shaheen & Lundberg, Chicago, Ill., for plaintiff-appellant; John M. Kaveny Chicago, Ill., of counsel.

Don H. Reuben, Howard Ellis, John E. Angle, of Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for defendant-appellee.

Before SCHNACKENBERG, KNOCH, and KILEY, Circuit Judges.

KILEY, Circuit Judge.

This is a diversity libel suit charging that Time, Incorporated, publisher of a

national weekly news magazine, defamed plaintiff Pape in an article based on *Justice,* volume 5 of the 1961 report of the United States Commission on Civil Rights.[1] The District Court dismissed the complaint on Time's motion, and plaintiff has appealed.

Time's motion admitted, for purposes of this appeal, the well pleaded facts: Plaintiff, at the time of the alleged libel was Director of Security for Chicago Thoroughbred Enterprises, Incorporated, which operated race tracks in metropolitan Chicago. He was on leave from his position as a captain of Chicago Police. He enjoyed a good reputation.

In its issue of November 24, 1961, Time published the alleged defamatory matter in reporting the filing of *Justice* by the Commission. The material subject of suit appears under "Part VII. Equal Justice Under Law." In Part VII are two chapters: "1. Introduction; and 2. Unlawful Police Violence."

Chapter 2, "Unlawful Police Violence," briefly describes eleven typical cases of police brutality. The Commission states: "The allegations of misconduct are supported in several cases by criminal convictions * * * or findings by impar-

tial agencies; in others, by sworn testimony, affidavits from eye witnesses, or by staff field investigations. In no case has the Commission determined conclusively whether the complainants or the officers were correct in their statements. This is the function of a court. The Commission is of the opinion, however, that the allegations appeared substantial enough to justify discussion in the study." [2]

The Time article, captioned "Civil Rights—Dawdling on the Corner," [3] was based on that part of Chapter 2 of the Commission Report entitled "Patterns of Police Brutality." Time noted the publishing of *Justice* by the Commission and went on to report incidents in Georgia and Chicago, two of the eleven incidents revealed in the Commission Report. The Chicago incident involved the arrest by Pape and other Chicago police officers of a Negro family named Monroe on Chicago's west side.[4]

The District Court's opinion, sustaining Time's motion to dismiss, was that the article was a fair and accurate account of the Commission's Report, a matter of public interest and legitimate subject of comment of an honest purpose; and that the article did not exceed the

1. Created by the Civil Rights Act of 1957, 42 U.S.C. § 1975, to study civil rights problems and report to the President and Congress. The Supreme Court described the Commission's statutory duties in Hannah v. Larche, 363 U.S. 420, at 441, 80 S.Ct. 1502, at 1514, 4 L.Ed.2d 1307 (1960):

> " * * * its function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action."

2. 5 U. S. Comm. on Civil Rights Report 5 (1961).

3. The caption "dawdling on the corner" is taken from a separate statement filed in the Report by Reverend Theodore M. Hesburgh, C.S.C., President of the University of Notre Dame, and a Member of the Commission. In part, Commissioner Hesburgh stated:

> Personally, I don't care if the United States gets the first man on the moon, if while this is happening on a crash basis, we dawdle along here on our corner of the earth, nursing our prejudices, flouting our magnificent Constitution, ignoring the central moral problem of our times, and appearing hypocrites to all the world.

5 U. S. Comm. on Civil Rights Report 168 (1961).

4. Based on the alleged wrongful conduct of Pape and his fellow officers in making that arrest, Monroe brought a civil rights suit which, on appeal, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), was remanded for trial to the Northern District of Illinois, Eastern Division.

bounds of fair comment and was not actionable.

The question is whether the District Court erred in finding, under Illinois law, that the complaint failed to state a claim upon which relief could be granted. The subordinate, vital question is whether Time's report of what the Commission said about the Pape incident is fair comment.

Time's article introduced the reader to *Justice* as carrying "a chilling text about police brutality" and that "it stands as a grave indictment, since its facts were carefully investigated by field agents and it was signed by all six of the noted educators who comprise the Commission." The reader is told, in a footnote, who the noted educators are.[5] Time's second paragraph begins, "The bluntly frank report tells of a police officer, referred to only as 'Y', in Dawson, Ga." This and the third paragraphs tell of the Georgia incident through quotations, detailing the police brutality, from the victim, Brazier, and his wife, and quotations from the Report. The third paragraph concludes in Time's statement, "Brazier died five days later, and 'Y' was never punished." In the fourth paragraph Time reported the Pape incident.

The Pape incident is set forth in the Commission Report in this way:[6]

> *Search, seizure, and violence: Chicago, 1958.*—The Supreme Court of the United States decided the case of Monroe v. Pape on February 20, 1961. Although this decision did not finally dispose of the case, it did permit the plaintiff to sue several Chicago police officers for violation of the Federal Civil Rights Acts

on the basis of a complaint which alleged that:[7]

> * * * [O]n October 29, 1958, at 5:45 a. m., thirteen Chicago police officers led by Deputy Chief of Detectives Pape, broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room; that the officers roused the six Monroe children and herded them into the living room; that Detective Pape struck Mr. Monroe several times with his flashlight, calling him "nigger" and "black boy"; that another officer pushed Mrs. Monroe; that other officers hit and kicked several of the children and pushed them to the floor; that the police ransacked every room, throwing clothing from closets to the floor, dumping drawers, ripping mattress covers; that Mr. Monroe was then taken to the police station and detained on "open" charges for ten hours, during which time he was interrogated about a murder and exhibited in lineups; that he was not brought before a magistrate, although numerous magistrate's courts were accessible; that he was not advised of his procedural rights; that he was not permitted to call his family or an attorney; that he was subsequently released without criminal charges having been filed against him.

Time began its report of the Commission's statement of the Pape incident this way: "Shifting to the North, the report cites Chicago police treatment of Negro

---

5. Members of the United States Commission on Civil Rights: Chairman Dr. John A. Hannah, President of Michigan State University; Vice Chairman Robert G. Storey, head of Southwestern Legal Center and former Dean of Southern Methodist University Law School; Reverend Theodore M. Hesburgh, President of the University of Notre Dame; Dr. Robert S. Rankin, Chairman of the Political Science Department, Duke University; Erwin N. Griswold, Dean of the Harvard

University Law School; and Spottswood W. Robinson III, Dean of the Howard University Law School.

6. 5 U. S. Comm. on Civil Rights Report 20, 21 (1961).

7. The Commission set forth the facts alleged in the complaint by quoting from Justice Frankfurter's dissent in Monroe v. Pape, 365 U.S. 167, 202–259, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

James Monroe and his family, who were awakened in their West Side apartment at 5:45 a. m. by 13 police officers, ostensibly investigating a murder." It continued: "The police, says *Justice,* broke through two doors * * *." Time then quoted the rest of the statement of the Commission verbatim. The Time paragraph concludes: "The officers were not punished, although Monroe has carried a suit to the Supreme Court, is still seeking a civil judgment."

 We agree with the District Court that Time was not absolutely privileged in writing the article. The absolute privilege of the Commission did not protect Time. It had a "qualified or conditional privilege," Cresson v. Dispatch Printing Co., 291 F. 632 (D.C. Minn.1923), to comment fairly upon, and criticize fairly, the Commission report. Under Illinois law, governing here, Time can be liable if it goes beyond that limit and "states as a fact that which is not true * * *." Cook v. East Shore Newspapers, Inc., 327 Ill.App. 559, 580, 64 N.E.2d 751, 761 (1945); Belt v. Tribune Co., 6 Ill.App.2d 489, 128 N.E.2d 638 (1955). "It is fundamental that fair comment and criticism cannot be predicated on an unfair or false statement of facts." Belt v. Tribune Co., 6 Ill.App.2d 489, at 494, 128 N.E.2d 638, at 640. The rule applies to writing about crime. Cook v. East Shore Newspapers, Inc., 327 Ill.App. 559, 585, 64 N.E.2d 751, 763 (1945).

 The test of the fairness of the Time article is the meaning which readers of common and reasonable understanding would ascribe to the language used, Belt v. Tribune Co., 6 Ill.App.2d 489, 493, 128 N.E.2d 638, 640 (1955). And as Justice John C. Lewe said in Dilling v. Illinois Publishing & Printing Co., 340 Ill.App. 303, 306, 91 N.E.2d 635, 637 (1950), " * * * a person of ordinary intelligence should read a newspaper article * * * with ordinarily intelligent discrimination."

 The question before us involves not what the Commission Report of 307 pages says of Pape, but only what the Time article says about the Report. The reader is set by the introduction, conditioned by the Georgia incident and its stark ending, and prepared to read how the Chicago police treated Monroe's family in the very early morning while "ostensibly" investigating a murder. Then the reader is told that *Justice* "says" Pape and others *did* what the Report merely said Monroe's complaint *alleged* Pape and others had done. The closing paragraph, relied on by Time to immunize it from liability, says the officers were not punished—as the article earlier stated "Y", in the Georgia incident, was not punished.

We conclude that Time took the risk, when it reworded parts of the Commission Report, that it might go too far, Cook v. East Shore Newspapers, Inc., 327 Ill.App. 559, 580, 582, 64 N.E.2d 751, 761, 763 (1945), quoting Judge O. W. Holmes, Jr. A jury could find that Time went beyond the limit of fairness here and in doing so was not protected by its privilege of fair comment, and that in making its article more interesting and readable for its audience, it departed from fidelity to the Commission Report. It is our opinion that a jury could read the Time article as stating that the Report said Pape and his follow officers *did* what the Commission Report merely said the Monroe complaint *alleged they did.* The typical newspaper reader could take from the article the impression that Pape and the other officers were not really investigating a murder when they mistreated the Monroe family, that the noted educators in *Justice* found that the Monroes were mistreated by Pape and the other officers, and that they were not being punished but ought to be.

It is true that the Commission had the facts alleged in the Monroe complaint, from which it quoted, investigated sufficiently to justify their use for the Commission's purposes in the Report. But the Commission was careful to state, at the beginning of its Report: "In no case has the Commission determined conclusively whether the complainants or the officers were correct in their state-

ments."[8] The Time article, however, does not say that. The article says that the Commission Report "stands as a grave indictment, since its facts were carefully investigated." But the Report does not say that. The "carefully investigated" statement in Time adds weight to its quotation, substituting the words "says *Justice*" for the words of the Report, " * * * a complaint which alleged that."

Time argues that the "innocent construction" rule requires this court to read the article "innocently," citing John v. Tribune Co., 24 Ill.2d 437, 442, 181 N. E.2d 105, 108 (1962). We are required by the rule in that case to give the Time article its "natural and obvious meaning." To read the article innocently, Time asks us to read the article as *not* saying what it does say. It says that the Civil Rights Commission said that Pape had, among other things, assaulted the Monroe family and violated their civil rights. In fact, the Commission said that a complaint in a civil action *alleged* that Pape had done those things.

The complaint states a claim upon which relief can be granted. The District Court erred in ordering it dismissed.

This court take judicial notice that, upon trial of Monroe v. Pape after remand by the Supreme Court, a verdict and judgment were recently entered for Monroe. After the District Court denied defendants' post-trial motions, except for a reduction of the verdict, Time made a motion in this court to dismiss the appeal for mootness. That motion was taken with the case and is hereby denied.

The judgment is reversed, and the cause remanded for further proceedings.

SCHNACKENBERG, Circuit Judge (dissenting).

The foregoing opinion's importance lies in its alarming invasion of the right of the press to publish its interpretation of the factual situation presented in an official report issued by a commission created by the Congress of the United States, 42 U.S.C.A. § 1975.

From the Commission's report entitled "Justice", it is clear that the Commission had a basis for the statements which it made in its report.[1] It referred, at page 105, to "a comprehensive review of available evidence", while, at page 5, it disclaimed making any conclusive determination as to whether the complainants or the police officers were correct in their statements, this being "a function of a court". But it expressly stated that "allegations of misconduct are supported in several cases by criminal convictions or findings by impartial agencies; in others, by sworn testimony, affidavits from eyewitnesses, or by *staff*[2] field investigations". That case not having come to trial in court at that time, the Commission, for convenience, expressly quoted the charges of the Monroe complaint as set forth by Mr. Justice Frankfurter in his dissent, 365 U.S. 167, at 203–204, 81 S.Ct. 473, at 492–493.

Justice dealt with numerous other cases where police brutality charges had been made, discussed violence by others than police, considered state and local remedies and the status and rights of the American Indian.

At 112, Justice made recommendations to Congress as to the advisability of remedial legislation. The report was duly transmitted to Congress.

The report known as Justice was privileged and non-actionable in a libel suit. A published article which fairly comments upon a governmental report is likewise privileged and nonactionable, under Illinois law. The publication in the case at bar is a fair comment upon the issuance of a governmental report and its contents. Plaintiff cannot force publishers, under threat of libel, to con-

---

8. 5 U. S. Comm. on Civil Rights Report 5 (1961).

1. Said act required the filing of a report. See § 1975c (b).

2. Italics supplied for emphasis. § 1975d (a) provided that there should be a full-time *staff* director for the Commission.

ceal the fact that the Commission pointed to his alleged conduct as a basis for its conclusions and recommendations to Congress.

I would affirm.