**Frank PAPE, Plaintiff,**

v.

**TIME, INCORPORATED, Defendant.**

**No. 61 C 2202.**

United States District Court
N. D. Illinois, E. D.

Jan. 16, 1969.

John M. Kaveny, White, Shaheen & Lundberg, Chicago, Ill., for plaintiff.

Don H. Reuben, John E. Angle, Lawrence Gunnels, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER ON MOTION FOR DIRECTED VERDICT

ROBSON, District Judge.

The defendant has moved for a directed verdict at the close of all the evidence. For the reasons set forth below, this court is of the opinion that the motion should be granted.

The plaintiff, Frank Pape, is suing Time, Incorporated for libel allegedly arising out of an article published November 24, 1961, which described the search of James Monroe's apartment on the west side of Chicago and Monroe's subsequent arrest by the plaintiff and seven fellow police officers. The plaintiff is a "public official," Pape v. Time, Incorporated, 354 F.2d 558, 560 (7th Cir. 1965), and in order for such a public official to recover a libel judgment against the present defendant, he must prove "with convincing clarity" that the article was false *and* was published with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 285–286, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). "Actual malice" has been defined as false statements published with knowledge that they are false, or with reckless disregard as to their truth or falsity. New York Times v. Sullivan, supra. "Reckless disregard" may be shown to exist where there exists "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* supra, 390 U.S. at 731, 88 S.Ct. at 1325. In addition, "recklessness may be found where there are obvious reasons to doubt the veracity of [an] informant or the accuracy of his reports." Id., at 732, 88 S.Ct. at 1326. In order to preserve First Amendment rights, it is clear that "some erroneous publications [must be protected] as well as true ones." In determining whether actual malice exists, the writer's personal belief that his story is true is important, but is only one factor to consider. Id., at 732, 88 S.Ct. 1323, 1326.

In the article complained of in this case, the defendant's writer, Edward F. Magnuson, a veteran reporter, purported to quote part of the publication, Justice, which was compiled by the members and staff of the United States

Civil Rights Commission. The portion of the article complained of is as follows:

"Shifting to the North, the report cites Chicago police treatment of Negro James Monroe and his family, who were awakened in their West Side apartment at 5:45 a.m. by 13 police officers, ostensibly investigating a murder. The police, says Justice, 'broke through two doors, woke the Monroe couple with flashlights, and forced them to leave their bed and stand naked in the center of the living room. The officers roused the six Monroe children and herded them into the living room. Detective Frank Pape struck Mr. Monroe several times with his flashlight, calling him "nigger" and "black boy." Another officer pushed Mrs. Monroe. Other officers hit and kicked several of the children and pushed them to the floor. The police ransacked every room, throwing clothing from closets to the floor, dumping drawers, ripping mattress covers.' The officers were not punished, although Monroe has carried a suit to the Supreme Court, is still seeking a civil judgment." Time magazine, November 24, 1961, at 16.

This quote omits the words which immediately preceded it. The Justice report states that these were allegations contained in a complaint. This omission, which has been ruled to be at least "negligent," is not enough to sustain the plaintiff's burden of proof (as outlined above), since the standard for actual malice is far stricter than the standard for negligence. Pape v. Time, Incorporated, 354 F.2d 558, 560 (7th Cir.1965). This court, therefore, must look further into the background of this article.

■ Mr. Magnuson testified that he read the omitted words, but decided not to include them in the article as it appeared in Time magazine. He explained the omission by pointing out that the Civil Rights Commission, appointed by the President, was set up by Congress to report on the problems of minorities, and its members were highly respected individuals. This meant to him, he testified, that if an example was used in the text of the report, it was considered by the Commission to be "substantially" true, no matter how the example was worded. In some of the examples, the words "alleged" or "allegation" were not used; in others, such as the one before this court, those words were used. Although the Justice report did warn that they had made no conclusive determination of the correctness of the statements of the complainants or officers, the report also said that "the allegations appeared substantial enough to justify discussion in this study." Justice, at 5. This statement modifies the whole report, and thereby makes almost all the examples contained in the report "allegations" of one sort or another, except where (in two cases) convictions had been obtained. Therefore, the appearance of the word "alleges" at the beginning of the section in Justice describing the plaintiff's activities is not of controlling significance. It was undisputed in the record that Mr. Magnuson in personal good faith interpreted the word "alleges" in the light suggested above. Professions of good faith, however, may not be sufficient in certain cases. *St. Amant,* supra. It is vital to describe the research that went into this article.

It has been stipulated between the parties that Mr. Magnuson consulted three sources before he wrote the article: the Justice report itself, a press release issued by the Civil Rights Commission concerning its Justice volume (Defendant's Exhibit [DX] G), and a news article in the New York Times of November 17, 1961 (DX H). All of these, if they mention the Pape incident at all, refer to the fact that the statements were contained in a complaint. After the article was drafted, it was sent to Champ Clark, then editor of the National Affairs Section, who in turn, according to an established procedure, sent it to the defendant's Research Department. The article was checked for factual accuracy by Miss Karen Burger (now Mrs. Karen Booth), whose deposition was

read in open court. Her job was to make corrections in consultation with the senior editor and the writer. She testified that she did not call the omission to their attention, since she had determined that the writer had good reasons for the omission and that the quote was factually accurate. In order to make this determination, she rechecked the three sources that Magnuson used, and also consulted the defendant's informational reference library, commonly known as the "morgue," and obtained all the materials relating to Frank Pape and the case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Stipulation, ¶¶ 25 and 26; DX I through DX P. In order to determine what information was available to the defendant, it will be necessary to examine some of these documents in more detail.

The article from the New York Post of Monday, February 27, 1961, DX I, purported to be a first person account by James Monroe of the events surrounding his arrest and subsequent release. The article does not state explicitly that Monroe's statements were merely allegations in a complaint, and the facts related by Monroe follow substantially the account given by Magnuson in the accused article. However, it should be noted that in the introductory paragraphs, the Post said that the narrative which followed was in Monroe's own words and was his "recollection of what happened." The introduction also points out that the Supreme Court has only allowed Monroe to "sue 13 white policemen for abusing him and his family," and that, impliedly, the actual facts might not be as described in the narrative.

The New York Times article (DX P) of February 21, 1961, sounds a similar cautionary note. It said that "[a] Chicago Negro handyman, James Monroe, brought the case after thirteen city policemen broke into his apartment early one morning. *He said* that they had hit him, made him and his wife stand naked while they searched the apartment without a warrant, then held him illegally in jail before finally releasing him without charges." (Emphasis added.) The reference to the fact that a case was brought, and that Monroe "said" that he had been abused highlight the apparent lack of certainty which the New York Times evidenced. Exhibit L also emphasized the fact that Monroe only "claimed" that certain facts were true, and this exhibit was a dispatch from Time's Chicago Bureau correspondent, Dudley Doust. Doust filed another report, one day later than Exhibit L, in which he did not mention that Monroe was only "claiming" that the incidents occurred (DX J). The account in this exhibit did support the statements as made in the accused article. The other articles refer to the decision in Monroe v. Pape, supra, and do not otherwise discuss the facts, or, they refer to the plaintiff as being an "ungodly tough," but much-decorated police officer. DX K, DX M and DX N.

The Seventh Circuit Court of Appeals, albeit before the *St. Amant* decision, supra, had determined that the defendant, when it reworded parts of the Justice report, took the risk that it "might go too far," and indicated that a jury, on the facts before it, could decide that the defendant's acts were "reckless." Pape v. Time, Incorporated, 318 F.2d 652, 655 (7th Cir. 1963), as quoted in Pape v. Time, Incorporated, 354 F.2d 558, 560 (7th Cir.1965). However, the court did not have the complete record before it, as is presently the situation before this court.

Even though the defendant showed at trial that the Monroes recovered an $8,-000 judgment against the plaintiff for violating their civil rights, this court assumes for the purpose of argument, that the plaintiff has established, through the eight police officers' testimony, that the statements in the article were substantially false. Even assuming this, the plaintiff has the burden of proving "with convincing clarity" that the article was published with actual malice. The statements set forth in the article

were only allowed to be published after other articles and dispatches were consulted and a good faith determination made by the writer and the researcher that the Commission had included the quoted portions with the intention that the facts be taken as "substantially" true. This case is far easier than the New York Times v. Sullivan case, supra, where there was no investigation whatsoever into the truth or falsity of the advertisement's representations. This case also does not fall within the *St. Amant* description of what kinds of publications fell outside the protections of the First Amendment. There the court said 390 U.S. at 732, 88 S.Ct. at 1326:

> "The defendant in a defamation action brought by a public official cannot * * * *automatically* insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, *for example*, where a story is *fabricated* by the defendant, is *the product of his imagination*, or is based wholly on an *unverified anonymous telephone call*. Nor will they be likely to prevail when the publisher's allegations are so *inherently improbable* that only a reckless man would have put them in circulation." (Emphasis added.)

This decision, after the cases in the Seventh Circuit, indicates that where good faith can be shown, as here, and there has been no "fabrication," etc., the First Amendment demands that judgment be rendered for the defendant publisher. Further emphasizing this conclusion is the possibility that if this case goes to the jury, that this would have a "chilling effect" on the exercise of First Amendment rights and might compel a degree of self-censorship because of the reluctance on the part of a publication to enter into expensive litigation. Dombrowski v. Pfister, 380 U.S. 479, 85 S. Ct. 1116, 14 L.Ed.2d 22 (1965), as cited in Time, Incorporated v. McLaney, 406 F.2d 565 (5th Cir. Jan. 3, 1969)..

At the close of plaintiff's case, defendant moved for a directed verdict. The court might well have granted this. However, in the exercise of extreme caution and with due regard for the statements made by the Court of Appeals in the other *Pape* cases, supra, the court decided to wait until all of the evidence was in and a complete record was made. At the conclusion of the introduction of all the evidence, any lingering doubt that the court may have had was completely eliminated.

It is therefore ordered that the defendant's motion for a directed verdict at the close of all the evidence be, and it is hereby granted.

It is further ordered that judgment be and it is hereby rendered for the defendant on the issue of liability, and the cause is hereby dismissed without costs.