# TIME, INC. *v.* PAPE

No. 109.   Argued December 16, 1970—Decided February 24, 1971

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BLACK, J., filed an opinion concurring in the judgment, in which DOUGLAS, J., joined, *ante,* p. 277. HARLAN, J., filed a dissenting opinion, *post,* p. 293.

*Don H. Reuben* argued the cause for petitioner. With him on the briefs were *Harold R. Medina, Jr.,* and *Lawrence Gunnels.*

*Patrick W. Dunne* argued the cause for respondent. With him on the brief were *Robert J. Nolan* and *Edward J. Hladis.*

MR. JUSTICE STEWART delivered the opinion of the Court.

In November 1961, the United States Commission on Civil Rights issued the fifth volume of its Report for that year, a document entitled Justice. A part of Justice was devoted to a study of "police brutality and related private violence," and contained the following paragraph:

"*Search, seizure, and violence: Chicago, 1958.*— The Supreme Court of the United States decided the case of *Monroe* v. *Pape* on February 20, 1961. Although this decision did not finally dispose of the case, it did permit the plaintiff to sue several Chicago police officers for violation of the Federal Civil Rights Acts on the basis of a complaint which alleged that:

". . . [O]n October 29, 1958, at 5:45 a. m., thirteen Chicago police officers led by Deputy Chief of De-

tectives Pape, broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room; that the officers roused the six Monroe children and herded them into the living room; that Detective Pape struck Mr. Monroe several times with his flashlight, calling him 'nigger' and 'black boy'; that another officer pushed Mrs. Monroe; that other officers hit and kicked several of the children and pushed them to the floor; that the police ransacked every room, throwing clothing from closets to the floor, dumping drawers, ripping mattress covers; that Mr. Monroe was then taken to the police station and detained on 'open' charges for ten hours, during which time he was interrogated about a murder and exhibited in lineups; that he was not brought before a magistrate, although numerous magistrate's courts were accessible; that he was not advised of his procedural rights; that he was not permitted to call his family or an attorney; that he was subsequently released without criminal charges having been filed against him." Justice 20–21.

A week later, Time, a weekly news magazine, carried a report of the Commission's new publication. The Time article began:

"The new paperback book has 307 pages and the simple title *Justice*. It is the last of five volumes in the second report of the U. S. Commission on Civil Rights, first created by Congress in 1957. *Justice* carries a chilling text about police brutality in both the South and the North—and it stands as a grave indictment, since its facts were carefully investigated

by field agents and it was signed by all six of the noted educators who comprise the commission."

There followed a description, with numerous direct quotations, of one of the incidents described in Justice, and then the following account of the Monroe incident:

"Shifting to the North, the report cites Chicago police treatment of Negro James Monroe and his family, who were awakened in their West Side apartment at 5:45 a. m. by 13 police officers, ostensibly investigating a murder. The police, says *Justice,* 'broke through two doors, woke the Monroe couple with flashlights . . . .' "

The Time article went on to quote at length from the summary of the Monroe complaint, without indicating in any way that the charges were those made by Monroe rather than independent findings of the Commission.

Pape sued Time for libel in the United States District Court for the Northern District of Illinois, there being diversity of citizenship. Time moved to dismiss the suit on the ground that the article was fair comment on a government report and therefore privileged under Illinois law; the District Court granted the motion, but the Court of Appeals for the Seventh Circuit reversed. 318 F. 2d 652. After remand, this Court decided *New York Times Co.* v. *Sullivan,* 376 U. S. 254, and on the basis of that decision the District Court granted Time's motion for summary judgment. On appeal, the Court of Appeals again reversed, holding that there must be a trial on the question of whether Time's failure to make clear that it was reporting no more than allegations showed "actual malice." 354 F. 2d 558.

At the trial, Pape called the policemen who had participated in the Monroe raid. They all testified that nothing resembling the events described in the Time

article as findings of the Commission had occurred.* There was also extensive testimony from the Time staff member who had written the article and from the "researcher" who had been responsible for checking its factual accuracy. The author testified that he had written the article on the basis of the Justice report itself, a Commission press release accompanying the report, and a New York Times news story describing Justice. He conceded that he knew the meanings of the words "alleged" and "complaint," but denied that the Time article was false, given the full context of the Justice report. The researcher testified that she had consulted several newspaper articles describing Monroe's claims about the raid, and several articles describing Pape's previous career. She said that she had also read two dispatches from Time's Chicago correspondent, one of them describing Monroe's charges without comment as to their truth and the other asserting as fact that the events had actually occurred. She conceded that she was aware of the omission of the word "alleged" in the Time article, but said that she believed the article to have been true as written.

At the close of the evidence, the District Court granted Time's motion for a directed verdict, 294 F. Supp. 1087, and Pape appealed for a third time. The Court of Appeals again reversed the District Court, holding that it was for the jury to determine whether Time's omission of the word "alleged" showed "actual malice." 419 F. 2d 980. We granted certiorari in order to decide the constitutional issue presented under the First and Fourteenth Amendments. 397 U. S. 1062.

---

*On January 24, 1963, after a jury finding of liability, judgment was entered against Pape in the civil rights suit brought against him by Monroe. The jury awarded Monroe damages of $8,000. Pape did not appeal, and the judgment was satisfied.

The District Court and the Court of Appeals were in agreement that the plaintiff Pape was a "public official" by virtue of his position as Deputy Chief of Detectives of the Chicago Police Department, and that the charges contained in the Monroe complaint, the Justice report, and the Time story concerned his "official conduct." The two courts differed only in their application of the rule of *New York Times Co.* v. *Sullivan,* 376 U. S. 254, which "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 279–280.

The only question before us, therefore, is whether the Court of Appeals correctly applied this constitutional rule to the facts of this case in reversing the directed verdict for the defendant. Inquiries of this kind are familiar under the settled principle that "[i]n cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will re-examine the evidentiary basis on which those conclusions are founded." *Niemotko* v. *Maryland,* 340 U. S. 268, 271. Cf. *Napue* v. *Illinois,* 360 U. S. 264, 271–272. And in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review "the evidence in the . . . record to determine whether it could constitutionally support a judgment" for the plaintiff. *New York Times, supra,* at 284–285; *Beckley Newspapers* v. *Hanks,* 389 U. S. 81, 83; *St. Amant* v. *Thompson,* 390 U. S. 727; *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6, 11.

The Time news article reported as a charge by the Commission what was, in its literal terms, a description

by the Commission of the allegations in a complaint filed by a plaintiff in a civil rights action. This situation differs in a number of respects from the conventional libel case. First, the publication sued on was not Time's independent report of the Monroe episode, but its report of what the Civil Rights Commission had said about that episode. Second, the alleged damage to reputation was not that arising from mere publication, but rather that resulting from attribution of the Monroe accusations to an authoritative official source. Finally, Time made no claim of good-faith error or mere negligence. Both the author of the article and the researcher admitted an awareness at the time of publication that the wording of the Commission Report had been significantly altered, but insisted that its real meaning had not been changed.

The Court of Appeals concluded that it was obvious that the omission of the word "allegation" or some equivalent was a "falsification" of the Report. Since the omission was admittedly conscious and deliberate, the only remaining question in the court's view was whether there had been "malice" in the sense of an "intent to inflict harm through falsehood." Such an intent, the court thought, might reasonably be inferred from the very act of deliberate omission, and the issue of malice was consequently one for the jury.

Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves. For example, in *St. Amant, supra,* it made good sense to separate the question of the truth of St. Amant's charges of corruption and official misbehavior from the question of whether he had an adequate basis to believe them true. But a vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what anybody *did*. Indeed,

perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the "truth" of such an indirect newspaper report presents rather complicated problems.

A press report of what someone has said about an underlying event of news value can contain an almost infinite variety of shadings. Where the source of the news makes bald assertions of fact—such as that a policeman has arrested a certain man on a criminal charge— there may be no difficulty. But where the source itself has engaged in qualifying the information released, complexities ramify. Any departure from full direct quotation of the words of the source, with all its qualifying language, inevitably confronts the publisher with a set of choices.

The Civil Rights Commission's Justice report is a typical example of these problems. The underlying story that gave the report newsworthiness was the picture of police violence against citizens. Many of the incidents included were quite clearly designed to shock, anger, and alarm the reader, indeed to move him into a position of support for specific legislative recommendations of the Commission. Yet the attitude of the Commission toward the factual verity of the episodes recounted was anything but straightforward.

First, the episodes were presented in the context of a report which from the first page purported to be dealing with a problem of unquestionable reality and seriousness:

> "In 1931 President Hoover's Wickersham Committee found extensive evidence of police lawlessness, including unjustified violence. Sixteen years later another Presidential Committee, this one appointed by President Truman, concluded that police brutality, especially against the unpopular, the weak, and the defenseless, was a distressing problem. And

now in 1961 this Commission must report that police brutality is still a serious problem throughout the United States." Justice 1.

Two pages later, the report said that

"The Commission is particularly impressed by the fact that most police officers never resort to brutal practices. Because of this fact, instances of brutality or discrimination in law enforcement stand out in bold relief. It is hoped that by focusing the attention of the President, the Congress, and the public on these remaining incongruities, this Report may contribute to their correction."

This process of focusing attention began on the next page with the chapter heading, in large type: "UNLAWFUL POLICE VIOLENCE." There followed the crucial description of the foundations on which the ensuing reports were based:

"In the text of this chapter the Commission briefly describes the alleged facts in 11 typical cases of police brutality. They are presented in the belief that they contribute to an understanding of the problem. The allegations of misconduct are supported in several cases by criminal convictions or findings by impartial agencies; in others, by sworn testimony, affidavits from eye witnesses, or by staff field investigations. In no case has the Commission determined conclusively whether the complainants or the officers were correct in their statements. This is the function of a court. The Commission is of the opinion, however, that the allegations appeared substantial enough to justify discussion in this study."

This statement may fairly be characterized as extravagantly ambiguous. On the one hand, what was to follow was "11 typical cases of police brutality," each

of which "contribute[s] to an understanding of the problem," and was "substantial enough to justify discussion" in the study. A range of sources was described, each of a nature to inspire confidence in the reader. *But,* the reader was nonetheless told that these were "alleged facts," "allegations of misconduct," which had not been "determined conclusively" to be "correct." The suggestion that such a conclusive determination could be made only by a court capped the confusion: in context it was impossible to know whether the Commission was seeking to encourage belief or skepticism regarding the incidents about to be described.

Turning the page, the reader was confronted with another heading in capitals, "PATTERNS OF POLICE BRUTALITY," and then the descriptions of the various incidents began. Each had an italicized heading (*e. g., "The killing of a Negro in Georgia: 1943"*) followed by an account giving both sides of the story and carefully describing all facts as "alleged" or using direct quotations. The tone of total neutrality as to the truth or falsity of the claims of brutality was frequently marred, however, by remarks that appeared to indicate the Commission's unexpressed views. At the end of a description entitled *"The killing of a Negro in Georgia: 1958,"* for example, the report said, "[n]o local disciplinary or criminal action was taken against any of the officers involved. The attitude of local authorities toward police was protective in this and several other cases of alleged brutality that occurred within a brief period . . . ." *Id.,* at 11.

The description of the Monroe incident bore the italicized title: *"Search, seizure, and violence: Chicago, 1958."* Unlike the reports of the other incidents, however, this report limited itself to the summary of a plaintiff's complaint in a lawsuit, as indicated at the outset of this opinion. No attempt was made to give any other version

of the story, and the next report (*"The killing of a Negro in Cleveland: 1959"*) followed immediately after the end of the quotation.

In a chapter entitled "Conclusions," the Commission set forth its findings and recommendations. These included a finding that "police brutality by some State and local officers presents a serious and continuing problem in many parts of the United States. Both whites and Negroes are the victims, but Negroes are the victims of such brutality far more, proportionately, than any other group in American society." The recommendations included proposals for a grant-in-aid program to improve the quality of state and local police forces and for passage of a federal statute outlawing illegal police violence. *Id.*, at 109–112. Since the series of incidents described earlier in the report was the only evidence the Commission presented in support of its findings and recommendations, there was a logically inevitable implication that the Commission must have believed that the incidents described had in truth occurred.

In light of the totality of what was said in Justice, we cannot agree that, when Time failed to state that the Commission in reporting the Monroe incident had technically confined itself to the allegations of a complaint, Time engaged in a "falsification" sufficient in itself to sustain a jury finding of "actual malice." The author of the Time article testified, in substance, that the context of the report of the Monroe incident indicated to him that the Commission believed that the incident had occurred as described. He therefore denied that he had falsified the report when he omitted the word "alleged." The Time researcher, who had read newspaper stories about the incident and two reports from a Time reporter in Chicago, as well as the accounts of Pape's earlier career, had even more reason to suppose that the Commission took the charges to be true.

Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times*. To permit the malice issue to go to the jury because of the omission of a word like "alleged," despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact.

*New York Times* was premised on a recognition that, as Madison put it, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 J. Elliot's Debates on the Federal Constitution 571 (1876). With respect to errors of fact in reporting events, we said in *New York Times:*

> "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions— and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." 376 U. S., at 279.

These considerations apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretation of the gist of a lengthy government document. Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury.

In certain areas of the law of defamation, *New York Times* added to the tort law of the individual States a constitutional zone of protection for errors of fact caused by negligence. The publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability. This protection would not exist for errors of interpretation were the analysis of the Court of Appeals to be adopted, for once a jury was satisfied that the interpretation was "wrong," the error itself would be sufficient to justify a verdict for the plaintiff.

In *St. Amant* v. *Thompson, supra,* at 731, we said:

"Our cases . . . have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison* v. *Louisiana,* 379 U. S. 64 (1964) . . . the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.' 379 U. S., at 74. . . . These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact

entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

Applying this standard to Time's interpretation of the Commission Report, it can hardly be said that Time acted in reckless disregard of the truth. Given the ambiguities of the Commission Report as a whole, and the testimony of the Time author and researcher, Time's conduct reflected at most an error of judgment. We have held that if "the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive,'" misstatements of this kind must have the protection of the First and Fourteenth Amendments. *New York Times, supra,* at 271–272.

We would add, however, a final cautionary note. Nothing in this opinion is to be understood as making the word "alleged" a superfluity in published reports of information damaging to reputation. Our decision today is based on the specific facts of this case, involving as they do a news report of a particular government publication that purported to describe the specific grounds for perceiving in 1961 "a serious problem throughout the United States." "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant* v. *Thompson, supra,* at 732.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For separate opinion of MR. JUSTICE BLACK, see *ante,* p. 277.]

MR. JUSTICE HARLAN, dissenting.

I would affirm the judgment of the Court of Appeals, essentially for the reasons stated in Judge Duffy's opinion for that court. The treatment of this case by our Court, however, prompts me to venture these additional comments.

I fully agree with the rule first enunciated in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), that restricts the liability of those who utter defamatory falsehoods regarding public officials. We there recognized that because "erroneous statement is inevitable in free debate," *id.,* at 271, "neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct." *Id.,* at 273. But these considerations did not persuade us to rule that the Constitution grants absolute immunity to everyone, be it the news media or anyone else, who libels a public official, or to conclude that the usual processes of law are inadequate for dealing with this kind of litigation. Rather, we decided that the substantial First Amendment interests implicated in any libel suit of this sort would be adequately served by a constitutional rule that subjects such a statement to the sanctions of the common law of libel only where it was uttered "with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 280.

The step taken today, whereby this Court undertakes to judge, "on the specific facts of this case," *ante,* at 292, whether a jury could reasonably find that Time magazine's characterization of the Commission's report was sufficiently inaccurate to permit the concomitant finding that it was published with "malice," is, in my judgment, not warranted.

I can perceive no rational basis for distinguishing this case from one in which a newspaper or an individual seeks to have this Court review the record upon which a properly instructed jury found liability, where evidence

sufficient to support its verdict exists, and where these matters have been reviewed by a court of appeals applying correct legal standards. As I see things, the Court identifies no such distinguishing feature about this case.

While it is true, of course, that this Court is free to re-examine for itself the evidentiary bases upon which rest decisions that allegedly impair or punish the exercise of Fourteenth Amendment freedoms, this does not mean that we are of necessity always, or even usually, compelled to do so. Indeed, it is almost impossible to conceive how this Court might continue to function effectively were we to resolve afresh the underlying factual disputes in all cases containing constitutional issues. Nor can I discern in those First Amendment considerations that led us to restrict the States' powers to regulate defamation of public officials any additional interest that is not served by the actual-malice rule of *New York Times, supra,* but is substantially promoted by utilizing this Court as the ultimate arbiter of factual disputes in those libel cases where no unusual factors, such as allegations of harassment or the existence of a jury verdict resting on erroneous instructions, cf. *New York Times, supra,* are present. While I am confident that the Court does not intend its decision to have any such broad reach, I fear that what is done today may open a door that will prove difficult to close.

Having determined that the court below properly defined the quality of proof required of Pape by *New York Times* and that it applied the correct standard of review in passing upon the trial judge's decision to grant a directed verdict—determinations that I do not think my Brethren dispute—I would stop the inquiry at this point and affirm the judgment of the Court of Appeals.