KAREN NELSON MOORE, Circuit Judge,
dissenting.
An arbitrator determined that on February 9, 1997, Police Sergeant James Young visited Marcey Phillips, a woman with whom he was having a consensual adult relationship, while on duty as a police officer. In his report, the arbitrator explored what might have occurred during that visit, but could not reach a conclusive determination given the total lack of credibility of both Young and Phillips. Thirteen years after this alleged incident, Theresa Herron relied on the details in the arbitrator’s report when she edited a story in the Milford-Miami Advertiser and inserted two paragraphs that included the sentence “Young had sex with a woman while on the *551 job.” Because I believe that Herron’s statement reflects a rational interpretation of the contents of the arbitrator’s report, an ambiguous document, and that upon de novo review there was insufficient evidence in the record to support a conclusion otherwise, I would hold that Herron did not act with actual malice as a matter of law. I therefore respectfully dissent.
As an initial matter, I disagree with the standard of review set forth by the majority. When a jury reaches a verdict in favor of a plaintiff on a defamation claim, we “have a constitutional duty to exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.” Harte-Hanks Commc’ns, Inc. v. Connaughton, 491 U.S. 657, 659, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). The Supreme Court has explained that use of the de novo standard is based “on the unique character of the interest protected by the actual malice standard.” Id. at 685-86, 109 S.Ct. 2678. “Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged.” Id. at 686, 109 S.Ct. 2678 (internal quotation marks omitted). I therefore cannot agree with the majority’s decision to hedge this de novo review by making the unsupported contention that this type of case requires greater deference to the jury’s findings than the type examined in Harte-Hanks. Maj. Op. at 549-50. The Supreme Court has imposed no such limitations, nor can any be inferred from its unmitigated defense of independent review.
Because “[t]his value must be protected with special vigilance,” the Supreme Court demands much of a plaintiff who seeks to show actual malice. Harte-Hanks, 491 U.S. at 687, 109 S.Ct. 2678. The Court has explained that “[a]ctual malice ... requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of reckless disregard cannot be fully encompassed in one infallible definition, we have made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication.” Id. at 667, 109 S.Ct. 2678 (internal citations, quotation marks, and alteration omitted). In other words, this is a subjective standard. For example, “failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.” Id. at 688, 109 S.Ct. 2678.
The district court chose to instruct the jury on the issue of actual malice based in part on language in Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). Specifically, the district court instructed the jury that “the adoption of a rational interpretation [of an ambiguous document], though arguably reflecting a misconception, does not constitute actual malice.” The Pape Court discussed this issue as follows: “Time’s omission of the word ‘alleged’ amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of ‘malice’ under New York Times.” 401 U.S. at 290, 91 S.Ct. 633. The issue we must resolve, then, is whether Herron’s assertion that “Young had sex with a woman while on the job” was a rational interpretation of an ambiguous document.
The document at issue, the arbitrator’s report, is undoubtedly ambiguous as to the question of whether “Young had sex with a woman while on the job,” as the arbitrator *552 was not responsible for, and therefore did not make, an express determination on that issue. Rather, the arbitrator was tasked with determining whether Young engaged in “sexual harassment that rise[s] to the level of rape” and “Neglect of Duty,” among other things. R. 52-4 (Arbitrator Report at 11, 20) (Page ID # 2152, 2161). Because there is no direct resolution of whether Young had sex with Phillips that night while he was on duty, the document is ambiguous.
Nonetheless, the arbitrator did make certain findings that can inform our analysis on the rational-interpretation issue. With respect to the rape charge, for example, the arbitrator concluded that because both Phillips and Young were not credible, the Employer has failed “to prove beyond a reasonable doubt that Mr. Young engaged in sexual behavior that was uninvited and unwanted by Ms. Phillips.” Id. at 18 (Page ID #2159); see also id. at 16 (Page ID #2157) (“The lack of truthfulness by both parties in this matter prevents any reasonable assessment of what happened on February 9th.”). In reaching this conclusion, the arbitrator noted that “the evidence and testimony create doubts as to whether the relationship went beyond what could be described as a private relationship between two consenting adults.” Id. at 18-19 (Page ID #2159-60). In other parts of his report, the arbitrator asserted that he “do[es] not doubt that [Phillips’s son] saw physical touching between his mother and Mr. Young” and again that “[t]he evidence and testimony more plausibly support a consenting relationship between Mr. Young and Ms. Phillips.” Id. at 15, 17 (Page ID # 2156, 2158) I believe that a rational inference gleaned from these statements is that Phillips and Young had a relationship that was sexual in nature during the time period in issue.
Importantly, the arbitrator also determined that Young was in neglect of duty on the night in question. In fact, he concluded that Young was in neglect of duty because he was at Phillips’s residence: “[o]n February 9, 1997 he did not leave the residence of Marcey Phillips immediately upon receiving a call.” Id. at 20 (Page ID #2161). The arbitrator also noted that this was not the first time that Young had been at Phillips’s apartment; he had “stopped by Ms. Phillips’ apartment on 6 or 7 occasions between January 12, 1997 and February 9, 1997.” Id. at 4 (Page ID # 2145). The arbitrator went into considerable detail as well regarding the evolution of their relationship, explaining that this relationship seemingly began after Phillips had ended a relationship with another man, and “was seeking solace and possibly more.” Id. at 15 (Page ID #2156). According to the report, “Mr. Young offered that solace and possibly more.” Id.
The totality of the statements made in this report lend support for Herron’s assertion that ‘Young had sex with a woman while on the job.” It is easy to infer from the report that Young and Phillips were engaged in a weeks-long relationship of a sexual nature and it was expressly found that Young had been at Phillips’s house while on duty during that time period. Although it cannot be said for certain that they did have sex while he was on duty, it is not irrational to reach that conclusion based on the statements made in the arbitrator’s report. In other words, I believe that Herron’s statement “amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities.” Pape, 401 U.S. at 290, 91 S.Ct. 633. “The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough” to support a finding of actual malice. Id. Although Herron’s statement certainly did not reflect a careful parsing *553 of the nuances present in this messy case, it was not an irrational interpretation of the arbitrator’s report.
The majority asserts that “while we must make an independent determination regarding whether there is sufficient evidence of the existence of actual malice, we can properly defer to the jury on historical facts, credibility determinations, and elements of statutory liability.” Maj. Op. at 549. It fails to make such an independent determination. Rather, the majority relies on the jury potentially finding that Her-ron’s interpretation of the arbitrator’s report was irrational, id. at 550, but Harte-Hanks cautions against precisely this type of reliance. Harte-Hanks unequivocally holds that the court must “make an independent de novo review of the entire record.” Harte-Hanks, 491 U.S. at 664, 109 S.Ct. 2678. The majority’s deference to the jury regarding whether Herron’s interpretation of the report was rational “incorrectly relied on subsidiary facts implicitly established by the jury’s verdict instead of drawing its own inferences from the evidence.” Id. I therefore cannot agree with either the majority’s reliance on the jury’s finding or with the majority’s conclusion.
Furthermore, without providing any legal support for its position, the majority opinion argues that it is “not ... clear that actual malice is the proper standard to apply in this case.” Maj. Op. at 549. The majority acknowledges that the Ohio Supreme Court in Soke v. The Plain Dealer, 69 Ohio St.3d 395, 632 N.E.2d 1282, 1283 (1994), has “held that police officers are public officials for defamation purposes.” Maj. Op. at 549. Despite the highest court of the state clearly holding that police officers are public officials for purposes of state defamation law, the majority questions whether such should be the case. The only justification advanced for questioning whether a rank-and-file police officer such as Sergeant Young is a public official for defamation purposes is that the Ohio Supreme Court “may have misinterpreted federal law on the issue,” id., in finding a detective, “being a police officer, is a public official,” Soke, 632 N.E.2d at 1284.
The Ohio Supreme Court, however, is not alone in its interpretation of federal precedent. The First Circuit has confirmed that a police officer serving as a resource officer at a middle school is a public official under Massachusetts law. Dixon v. Int’l Bhd. of Police Officers, 504 F.3d 73, 88 (1st Cir.2007). The Third Circuit held that a rookie patrol officer is a public official. Coughlin v. Westinghouse Broad. & Cable Inc., 780 F.2d 340, 342 (3d Cir.1986). The Fifth Circuit concluded that a patrol officer is a public official. McKinley v. Baden, 777 F.2d 1017, 1021 (5th Cir.1985). The Seventh Circuit held that federal law-enforcement agents are public officials. Meiners v. Moriarity, 563 F.2d 343, 352 (7th Cir.1977). The Eighth Circuit acknowledged that a police officer patrolling a demonstration was a public official for defamation purposes. Speer v. Ottaway Newspapers, 828 F.2d 475, 476 (8th Cir.1987). The Ninth Circuit found that a city police officer was a public official requiring proof of actual malice in a defamation case. Rattray v. City of Nat’l City, 36 F.3d 1480, 1486 (9th Cir.1994). Finally, in a widely cited opinion, the Tenth Circuit held that the chief investigator for the county attorney was a public figure in pressing his defamation claim regarding his alleged acts when he was a “normal street patrolman.” Gray v. Udevitz, 656 F.2d 588, 591 (10th Cir.1981). I have been unable to find a circuit court holding to the contrary.
The overwhelming and entirely one-sided decisions by our sister circuits leave no doubt that police officers are public officials for defamation purposes. Courts *554 have uniformly applied the actual malice standard to police officers because there is a strong societal interest in protecting expression that criticizes law enforcement officers. Meiners, 563 F.2d at 352 (“The public is certainly interested in an important and special way in the qualifications and performance of federal agents ... whose decisions to search and to arrest directly and personally affect individual freedoms.”). As a polity, we grant police officers extraordinary power: to arrest suspects curtailing citizens’ liberty, to search private areas invading individual privacy, and, when the circumstances require it, even to use deadly force. In light of this extraordinary power, criticism of police officers in the performance, or lack thereof, of their duties, ought receive the full protection of the First Amendment whether those officers are the chiefs of police, captains, detectives, or rank-and-file officers walking a beat. Gray, 656 F.2d at 591 (“The cop on the beat.... possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms.... The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant[s] the conclusion that he is a public official.”).
Given the clear holding of the highest court of Ohio that police officers are public figures under its defamation law, confirmed by the uniform conclusions of our sister circuits and supported by strong policy rationales, I am left with no doubt that Sergeant Young’s defamation claim, even though he is a rank-and-file police officer, is subject to the actual malice standard.
For these reasons, I respectfully dissent.