763 F.2d 1472
 246 U.S.App.D.C. 211
 William P. TAVOULAREAS, Appellant,
Peter Tavoulareas
v.
Philip PIRO.
William P. TAVOULAREAS, Appellant,
Peter W. Tavoulareas
v.
The WASHINGTON POST COMPANY, d/b/a The Washington Post, a
Delaware Corporation, et al.
 Nos. 83-1604, 83-1605.
 United States Court of Appeals,
District of Columbia Circuit.
 June 11, 1985.
Opinion on Rehearing En Banc June 11, 1985.*
 
 Edward Bennett Williams, David E. Kendall, Kevin T. Baine, and Scott M. Matheson, Jr., Washington, D.C., were on the Petition of Appellees The Washington Post Co. and Patrick Tyler for Rehearing by the Panel.
 David Machanic, Washington, D.C., was on the Petition of Appellee Philip Piro for Rehearing by the Panel.
 H. Bartow Farr III, Robert D. Luskin, and Paul M. Smith, Washington, D.C., were on the Petition of Appellee Sandy Golden Regarding Petitions for Rehearing by the Panel.
 On Petition to the Panel for Rehearing.
 Before WRIGHT and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 
 
 1
 Opinion for the Court filed by Senior Circuit Judge MacKINNON.
 
 
 2
 Dissenting statement filed by Circuit Judge SKELLY WRIGHT.
 
 
 3
 MacKINNON, Senior Circuit Judge (SCALIA, Circuit Judge, concurring):
 
 
 4
 Attorneys for the Washington Post Co. and Patrick Tyler have requested this division of the court to rehear the foregoing decision.[1] However, the argumentative support for the petition is fatally defective in three principal respects, among others.
 
 
 5
 First, it ignores the evidence of record and misrepresents the court's decision as a general "disparagement of investigative reporting" that seeks to premise "constitutional malice" on pure "hard-hitting investigative stories [and] ... high-impact investigative stories of wrongdoing ... [by a] newspaper [that] is generally vigorous in its efforts to seek out and report the news." Petition at 2-3. That description completely refuses to recognize the evidence of very substantial "pressures " and lax editorial processes that were fully developed in the record and that contributed materially to the finding by the jury that the Post article on Tavoulareas recklessly disregarded the truth. Media advocates, like those who have filed an amicus brief in support of rehearing, should take a hard look at the evidence in this case before attempting to come to the defense of the Post's so-called "investigative reporting" as it appears in this transcript. It is not normal "investigative reporting."
 
 
 6
 Second, the Petition for Rehearing contains not one line recognizing the reality that the Post is confronted with an adverse jury verdict and that the law applicable to judgments notwithstanding the verdict (j.n.o.v.) does not confer free reign to override the credibility findings inherent in the jury verdict. This case is not like Bose Corp. v. Consumers Union of United States, Inc., --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), which involved a bench trial and written findings by the judge. Instead we must first determine what findings of fact the jury verdict could be based upon. Neither the petitioners nor the dissent recognizes this obligation, much less applies the law applicable to jury findings in such cases.
 
 
 7
 Third, the petition does not face up to the Peterson memorandum, the general unreliability of sources, the permissible effect on the jury verdict of the Post's failure to introduce one line of the deposition of Comnas, who was the Post's principal source, and to even recognize that Checket personally contradicted Tyler's written note that he had overheard Tavoulareas stating he personally dispatched Hoffmann to Atlas. This latter point also is contradicted by Wolfe's testimony that he made the decision to send Hoffmann to Atlas (Tr. 1098).
 
 
 8
 In sum, the Post presented a weak defense highlighted by the complete failure to present one bit of the deposed testimony of the principal source they allegedly relied upon for the story. Their whole defense was dependent upon the credibility of their few witnesses which the jury obviously did not believe--and the jury was not required to believe them, because their testimony in its critical aspects was specifically contradicted by plaintiff's witnesses which we find were reasonably believable.
 
 A. The Court's Task
 
 9
 This case required us to perform "the delicate and sensitive task of accommodating the First Amendment's protection of free expression of ideas with the common law's protection of an individual's interest in reputation." Ollman v. Evans, 750 F.2d 970, 974 (D.C.Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Our duty was twofold: to protect the "freedom of ... the press" privilege of the First Amendment and to remedy harm to innocent persons caused by abuse of that privilege. As was recognized in Ollman, this task is by no means new and is clearly a difficult one. The principle that "debate on public issues should be uninhibited, robust, and wide-open," Tavoulareas v. Piro, 759 F.2d 90, 166 (D.C.Cir.1985) (Wright, J., dissenting) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), must be reconciled with "an individual's interest in his or her reputation [which] is of the highest order," Ollman, supra, at 974. Again, as was emphasized in Ollman, the protection of one's reputation
 
 
 10
 is an eloquent expression of the respect historically afforded the dignity of the individual in Anglo-American legal culture. A defamatory statement may destroy an individual's livelihood, wreck his standing in the community, and seriously impair his sense of dignity and self-esteem.
 
 
 11
 Id. (footnote omitted); accord, Herbert v. Lando, 441 U.S. 153, 169, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979).
 
 
 12
 It is within the framework of New York Times v. Sullivan and its progeny that the two competing interests of robust debate and the justifiable protection of individual reputations must be accommodated. Petitioners Washington Post Co. and Patrick Tyler first argue that the panel opinion "fundamentally alters the very concept of 'actual malice,' " that evidence considered relevant in this case on the actual malice issue has been held by the Supreme Court to have "no bearing" on that issue, and--principally--that "cumulation" of the evidence was improper. Petitioners then challenge the standards for appellate review of the jury verdict. We address these arguments below. Those arguments not addressed have been adequately considered in the original opinion.
 
 B. The Actual Malice Standard
 
 13
 The definition of "actual malice" is unmistakably clear: the defamatory falsehood must be made with knowledge of its falsity or with reckless disregard for the truth. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). This test is disjunctive, and the panel opinion finds liability most clearly under the "reckless disregard" standard. Tavoulareas v. Piro, 759 F.2d 90, 104 (D.C.Cir.1985). Despite present protestations by petitioners to the contrary, the panel opinion points out that reckless disregard is not the general tort concept but involves a substantial state of mind inquiry. See, e.g., at 104 & n.13. The question is whether sufficient evidence was adduced at trial to show that The Washington Post, through its reporters and editors, "in fact entertained serious doubts as to the truth of [the] publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). This is essentially a fact-bound inquiry, which was resolved against the Post defendants by the jury. Given the wholesale rejection of adverse inferences, and the author's willingness to rely on extravagant speculation to conclude that Tavoulareas' motive in establishing the Mobil-Samarco-Atlas relationship was to benefit his son, it was reasonable for the jury to conclude, as it must have, that the author entertained serious doubts about the truth of the basic charge made by the article.
 
 
 14
 The defendants' petition represents to this court that "only 'calculated falsehood' is unprotected by the actual malice standard." Petition at 2. This is simply not the law. Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), stated that both "the knowingly false statement [i.e., calculated falsehood] and the false statement made with reckless disregard of the truth [what we have here], do not enjoy constitutional protection." (Emphasis added). See also Curtis Publishing Co. v. Butts, 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094 (1967) (Opinion of Harlan, J.) (recovery is permitted where "the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity ") (emphasis added); id. at 164, 87 S.Ct. at 1996 (Opinion of Warren, C.J.) (" '[A]ctual malice' is not so restrictive that recovery is limited to situations where there is 'knowing falsehood' on the part of the publisher of false and defamatory matter. 'Reckless disregard' for the truth or falsity, measured by the conduct of the publisher, will also expose him to liability for publishing false material which is injurious to reputation.") (emphasis added).
 
 
 15
 In Time, Inc. v. Pape, 401 U.S. 279, 291, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971), the Court, quoting St. Amant, supra, 390 U.S. at 731, 88 S.Ct. at 1325, returned to its prior opinions which outlined by adjudication the definition of "a reckless publication." New York Times, the Court stated, required a finding that "the publisher was aware of the likelihood that he was circulating false information." Garrison echoed this necessity for a showing that a false publication be made with "a high degree of awareness of ... probable falsity." 379 U.S. at 74, 85 S.Ct. at 215. See also St. Amant, 390 U.S. at 731, 88 S.Ct. at 1325. And recently in Herbert v. Lando, the Court defined the standard as requiring a "subjective awareness of probable falsity." 441 U.S. at 156, 99 S.Ct. at 1639 (quoting Gertz, 418 U.S. 323, 335 n.6, 94 S.Ct. 2997, 3005, n.6, 41 L.Ed.2d 789 (1974)). In painstaking fashion, this court's opinion detailed the evidence which, true to Supreme Court precedent, supports this definition of liability. At 113-36. It is significant, as noted above, that petitioners presently have left untouched three major categories of evidence relevant to our reinstatement of the jury verdict: (1) the Christine Peterson memorandum, which we found indicated the publisher's "serious doubts"; (2) the reliability of sources (except Comnas, who petitioners presently maintain was reliable[2]); and (3) the "personally dispatched"--Everett Checket conversation.
 
 
 16
 It is also most important to note that Peterson, the Post's copy editor, placed the same interpretation on the article as that set forth in the complaint and accepted by the jury, i.e., that it charged:
 
 
 17
 ... that Tavoulareas alone ... put together such a scheme for the sake of his son's business career....
 
 
 18
 (J.A. 2486); at 114-15. That interpretation was fully supported by the article and by the testimony at trial.
 
 C. Proof of Actual Malice
 1. The Editorial Process
 
 19
 Petitioners argue that the court's conclusion that the defendants' selection of the most damaging and sensational inferences from the evidence was probative of actual malice is contrary to Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). Yet, as we pointed out, Pape never said that such choices were irrelevant. The Court in Pape was careful to limit its decision to the specific facts of the case, id. at 292, 91 S.Ct. at 640, upon which the Court ultimately was unwilling to impose liability for what amounted to a single "misstatement," id., or a "malapropism," Bose Corp. v. Consumers Union of United States, Inc., --- U.S. at ----, 104 S.Ct. at 1967. The present case involves not a single misstatement or malapropism but rather a pattern of construing the underlying events, despite serious doubts about their truthfulness, to support a premature notion of the story, conceived during the very first interview of a source known to be highly biased and prejudiced.
 
 
 20
 Petitioners also assert that Pape holds "it is beyond the province of any court or jury to consider the editorial 'choices' " that determine the variety of factual "shadings" of a news account. Again, Pape neither holds nor suggests so. Pape acknowledges that because press reports can contain "an almost infinite variety of shadings," the publisher is often presented with a "set of choices" to be made. 401 U.S. at 286, 91 S.Ct. at 637. On the record in Pape, the Court concluded that "Time's conduct [omitting the single word "alleged"] reflected at most an error of judgment," and that "misstatements of this kind " are protected. Id. at 292, 91 S.Ct. at 640 (emphasis added). Nowhere does the Court in Pape remove review of editorial choices from the province of the judge or jury. Such an extreme position is irreconcilable with the fact that the subjective state of mind is the very essence of the tort.
 
 
 21
 Petitioners' contentions that judges and juries cannot review a newspaper's editorial decisions are not supported by Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In Herbert, a public figure plaintiff sought discovery into the editorial process of the media defendants. The defendants refused to respond "on the ground that the First Amendment protected against inquiry into the state of mind of those who edit, produce, or publish, and into the editorial process." Id. at 157, 99 S.Ct. at 1639. In a clear rejection of the claim, the Court reaffirmed that New York Times and its progeny make it essential to proving liability that the plaintiff focus on the defendant's conduct and state of mind. The Court flatly refused to adopt the defendants' claim of privilege that would "immunize from inquiry the internal communications occurring during the editorial process and thus place beyond reach what the defendant participants learned or knew as the result of such collegiate conversations or exchanges." Id. at 171, 99 S.Ct. at 1646. In the words of the Court:
 
 
 22
 To erect an impenetrable barrier to the plaintiff's use of such evidence [of editorial processes] on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with "convincing clarity." New York Times Co. v. Sullivan, 376 U.S. at 285-286 [84 S.Ct. at 728-729].
 
 
 23
 441 U.S. at 170, 99 S.Ct. at 1646 (footnote omitted).
 
 
 24
 Thus, evidence of the editorial process through which a challenged article passed is relevant, indeed almost indispensable, to a defamation plaintiff's case. Petitioners' claim that New York Times bars such evidence confuses relevancy with the actual malice standard of proof, which itself affords protection to media defendants and the First Amendment. That the Court set a high standard of proof does not mean that it also meant to exclude relevant evidence.[3]
 
 2. Other Factors
 
 25
 Petitioners challenge the relevancy of what we held were "other indicia of actual malice." At 131.
 
 
 26
 Knowledge of Harm. The court's opinion finds the petitioners' knowledge of harm likely to befall the plaintiff following publication relevant to the actual malice determination. Petitioners now object that this conclusion contravenes the law of this circuit as enunciated in Washington Post Co. v. Keogh, 365 F.2d 965 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). According to petitioners, the publisher's knowledge of harm "is not probative" of actual malice. What Keogh in fact says, however, is that "the seriousness of a charge, in itself, is not probative of recklessness." Id. at 970 (emphasis added). It is perfectly consistent with Keogh to say that such evidence is relevant. Moreover, we find unpersuasive petitioners' suggestion that the Supreme Court's failure to mention this factor indicates that Court's sub silentio rejection of it. On its face, the contention that knowledge of harm is irrelevant is absurd. A small amount of support would presumably suffice to render an apparently innocuous statement immune from a finding of actual malice. A reporter's interview with a single unidentified person claiming to have been a witness would be adequate, one supposes, to immunize the statement that Mr. Tavoulareas wore a dark suit and a blue tie at a certain public event. To say that similarly slim support would immunize the statement that Mr. Tavoulareas tried to assassinate the president is to ignore the fact that the requisite degree of care (and hence the existence of recklessness) depends, in this area of tort law as elsewhere, upon the perceived danger of harm.
 
 
 27
 Lack of Deadline Pressure. This story was not "hot news." That "[a]bsence of time pressure ... is evidence that the jury could fairly consider" is documented extensively in the panel opinion. At 131 (emphasis added).
 
 
 28
 Failure to Retract. Evidence of the Post's steadfast refusal to retract was properly considered as bearing on the issue of actual malice. It in no way demonstrates the irrelevance of this evidence to point out, as petitioners do, that it may sometimes demonstrate the lack of malice--as showing continued genuine belief in the published account. As we noted in our opinion, at 132 n.51, relevant evidence may often point in one direction or the other, depending upon the circumstances--as in a criminal trial ownership of the murder weapon may tend to show guilt or, if the defendant was too clever to use his own weapon and had others readily at hand, may tend to show innocence as well. It is for the jury to decide which conclusion the circumstances justify. In this case the overwhelming evidence showing that the Post article was wrong, some of which was brought to the Post's attention in a detailed, four-page letter from Tavoulareas and in his subsequent conversation with Post management officials, justified the conclusion that the failure to retract displayed a blatant lack of concern for damage wrongfully done to Tavoulareas' reputation--which tends to reinforce the belief that such an attitude permeated the Post's treatment of this story from the outset. As petitioners point out, the Supreme Court in New York Times decided not to rely on evidence of a failure to retract as proof of actual malice. But that was a fact-specific conclusion, far from enunciating a general rule. 376 U.S. at 286, 84 S.Ct. at 729 ("Whether or not a failure to retract may ever constitute such evidence [of actual malice], there are two reasons why it does not here."). It is entirely consistent with New York Times that "[u]nder certain circumstances evidence [of a refusal to retract] ... might be relevant in showing recklessness at the time the statement was published." Restatement (Second) of Torts Sec. 580A comment d (1977).
 
 3. The Cumulative Nature of the Evidence
 
 29
 According to petitioners, the evidence of actual malice does not gain probative force through "cumulation." This is an unreasonable view and is simply not the law.
 
 
 30
 Our "cumulation" of evidence on the actual malice issue--which petitioners claim worked some new advantage into a libel plaintiff's case--is based on well-settled principles of law. Since Goldwater v. Ginzburg, it has been recognized that
 
 
 31
 the jurors ... should consider all the evidence concerning [defendants'] acts and conduct in publishing [the piece] in deliberating upon whether the defendants published with actual malice. There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cummulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.
 
 
 32
 414 F.2d 324, 342 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) (emphasis added) (citing Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)). And recently in Bose Corp. v. Consumers Union of United States, Inc., the court of appeals reaffirmed this "accumulation" principle, noting:
 
 
 33
 A court typically will infer actual malice from objective facts. Oakes, [Proof of Actual Malice in Defamation Actions: An Unresolved Dilemma, 7 Hofstra L.Rev. 655, 666-67 (1979) ] (quoting Washington Post Co. v. Keogh, 365 F.2d 965 (D.C.Cir.1966), cert. denied, 385 U.S. 1011 [87 S.Ct. 708, 17 L.Ed.2d 548] ... (1967)). These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice....
 
 
 34
 692 F.2d 189, 196 (1st Cir.1982), aff'd, --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (emphasis added).
 
 
 35
 That no piece of evidence in a defamation suit alone will support a verdict does not mean that together all the evidence may not be clear and convincing. Pieces to a jigsaw puzzle sometimes appear nothing more than scattered fragments, but when placed together in proper fashion they create a clear picture.
 
 
 36
 4. Evidence of Pressure The Post Placed on Reporters and its Relationship to The Post's Investigative Reporting
 
 
 37
 Petitioners object to what they term "the majority's disparagement of investigative reporting." This claim as stated raises concern because it is incorrect and misperceives the thrust of that section of the opinion. It thus warrants some extended discussion here.
 
 
 38
 The focus of this section of the opinion is on the evidence that Assistant Managing Editor Robert Woodward placed excessive pressure on reporters to produce high-impact stories. The editor admitted he told his reporters that "you have to have a compulsive need to succeed ... and to want desperately to please your boss." At 121 (emphasis added). Evidence was also presented that "the boss" was "looking for something [he] called a holy shit story," At 121--presumably a story so startling in its revelations as to cause the reader to exclaim in this fashion. We held that the jury was entitled to consider this pressure for shocking exposes in evaluating the state of mind of those responsible for the Tavoulareas story. Thus, the situation was very much like that in Curtis Publishing Co. v. Butts, where Justice Harlan, noting the probative effect there of editorial pressures to publish such "high-impact" investigative stories, concluded:
 
 
 39
 The Saturday Evening Post was anxious to change its image by instituting a policy of "sophisticated muckraking," and the pressure to produce a successful expose might have induced a stretching of standards. In short, the evidence is ample to support a finding of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.
 
 
 40
 388 U.S. 130, 158, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967) (Opinion of Harlan, J.) (emphasis added). See also id. at 162, 169, 87 S.Ct. at 1995, 1999 (Warren, C.J., concurring in the result).
 
 
 41
 These excerpts from Supreme Court opinions suffice, if reason alone would not, to demonstrate that managerial pressure to produce sensationalistic stories is relevant to the malice determination and is therefore properly admissible. The Post's conviction that such evidence cannot be considered is apparently a recently acquired one, since extensive examination of Robert Woodward on this subject was admitted at trial without objection from the defendant's experienced counsel.
 
 
 42
 The Post's argument seeks to equate our holding on this point with a general disparagement of investigative journalism. The equation is false, unless one thinks that investigative journalism cannot be distinguished from irresponsible sensationalism. Here again, the Post's position is a recently adopted one. In the self-criticism which that paper undertook after exposure of the so-called "Jimmy's World" hoax, a series of articles published by the Post, within 10 months of the Tavoulareas story, concerning an 8-year-old heroin addict--articles successfully nominated for a Pultizer Prize but later shown to be a fabrication--the Post displayed an apparent awareness that a proper zeal for investigative journalism and a distorting pressure for titillating exposes are two different things. The paper wrote:
 
 
 43
 The troubling question is whether pressure on the staff distorts the news published in the paper....
 
 
 44
 Lewis Simons of Metro says: "Pressures are so great to produce, to go beyond excellence to the 'holy s---' story. Everyone knows that's what the editors want: The pressure is to get the incredible story, the extraordinary story.
 
 
 45
 "People want to succeed. They bust their ass to succeed here.... It can result in overselling a story...."
 
 
 46
 ....
 
 
 47
 [S]ome reporters said they felt strongly that the "system" at The Post has editors making demands on reporters that cannot be met. That reporters are made to feel they are failures when they cannot meet those demands....
 
 
 48
 ....
 
 
 49
 ... Editors are somewhat infected too....
 
 
 50
 The Washington Post, Apr. 19, 1981, at A15.
 
 
 51
 "... [Coleman (city editor) ] said he believed the story," Applin-Brownlee recalls now. "I didn't have to ask why. He believed it because he wanted to."
 
 
 52
 Id. at A13. We note this self-assessment not, of course, to demonstrate that undue pressure likely to produce knowingly false stores existed at the Post during the period in question here. That judgment was for the jury, to be made on the basis of the evidence on the point introduced at trial. But the Post's assertion of the utter irrelevance of that evidence--and its accompanying accusation that our disagreement is a manifestation of hostility towards investigative journalism--rings particularly hollow beside its own earlier expression of concern regarding the same consequences of the same phenomenon. In its search for the truth of this matter, the jury need no more blind itself to the effects of undue pressure for startling exposes than the Post did. And by declining to immunize such undue pressure through the creation of a novel First Amendment rule that this obviously relevant evidence cannot be considered, this court no more shows itself to be an enemy of investigative journalism than did the members of the Post's staff who criticized the same excess. In short, it seems to us that it is the Post, rather than the opinion of this court, which disparages investigative journalism by equating its pursuit with the pursuit of sensationalism that the evidence here at issue tended to establish.
 
 D. The Duty of Independent Review
 
 53
 Petitioners first maintain that our conclusion that our independent judgment need not be applied to each separate fact determination forming the basis for the constitutional fact determination of actual malice conflicts with Bose's requirement that we "independent[ly] assess[ ] ... the evidence germane to the actual malice determination." --- U.S. at ---- n.31, 104 S.Ct. at 1967 n.31. We found no such conflict. The question is how deep into the initial fact finding process an appellate court must delve in a libel appeal. We explained in detail that Bose's statement that "First Amendment questions on 'constitutional fact' compel this Court's de novo review," id. at ---- n.27, 104 S.Ct. at 1964 n.27, must be limited to the ultimate constitutional fact, or else all factual determinations in a First Amendment case would be for the court. At 108. This states the "constitutional responsibility that cannot be delegated to the trier of fact." Bose, at ----, 104 S.Ct. at 1959. Appellate courts are not to examine the evidence of both parties and then decide which to believe. For nothing in New York Times or Bose suggests that we deprive the trier of fact of its opportunity to assess credibility ("the constitutionally-based rule of independent review permits this opportunity to be given its due," Bose, at ----, 104 S.Ct. at 1959; accord Patton v. Yount, --- U.S. ----, ----, 104 S.Ct. 2885, 2893, 81 L.Ed.2d 847 (1984)) or that we set aside jury determinations on preliminary factual issues. Indeed, given our appellate posture, which is far removed from the fact finding process, such second-guessing of preliminary evidence would require this court to perform a function for which we are simply unequipped. Thus, it is the application of the rule (the constitutional function) rather than the finding of subsidiary facts to which Bose primarily speaks. Bose, --- U.S. at ---- - ---- & n.16, 104 S.Ct. at 1959-60 & n.16, 80 L.Ed.2d 502.
 
 
 54
 Petitioners argue that, by virtue of our refusal both to make "a general appraisal of the evidence," at 109, and to evaluate evidentiary inferences in favor of the defendants, at 133, we "ignored" our duty to review the "whole record." To petitioners it is irrelevant that this case comes to us in a j.n.o.v. posture from a trial court's reversal of a jury verdict. They utterly fail to mention that fact, let alone attempt to reconcile the j.n.o.v. posture of this case with our duty to conduct an independent review of the whole record--beginning with the facts obviously found by the jury. Petitioners give no indication how they would treat credibility evidence, let alone how they should, or for that matter could, make evidentiary findings concerning subsidiary factual issues. In applying the j.n.o.v. standard, we were required to draw all reasonable inferences in favor of the jury verdict. That we have done. To have drawn inferences against the jury verdict, as petitioners suggest, would have engaged this court in the task of redeciding purely factual issues and ignoring many credibility findings obviously made by the jury, rather than reviewing the record to determine if the evidence could constitutionally support the verdict. Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971).
 
 
 55
 That we grant inferences in favor of the jury verdict does not mean that we did not review the "whole record." Quite the contrary. We reviewed the whole record to assess whether all the evidence, taken with the inferences reasonably to be drawn in favor of the jury verdict, was sufficient to satisfy us that the proof was adequate to cross the constitutional threshold. Bose, --- U.S. at ----, 104 S.Ct. at 1965. We were satisfied that it was. Had reasonable inferences from all the evidence not been capable of establishing clear and convincing proof of fault, the judgment of the district court would necessarily have been affirmed.
 
 CONCLUSION
 
 56
 Defamation cases present difficult questions. This case has proven that. Controversies such as this one, however, are decided on their merits, not by reference to statistical studies for appellate reversal of libel verdicts. See Petition at 7 n. 8. As we have stated, the issue is not whether we would have decided the case differently had we sat in the jury box. Rather, it is " 'whether [all the evidence in the record] could constitutionally support a judgment' for the plaintiff." Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 637, 28 L.Ed.2d 45 (1971) (quoting New York Times, 376 U.S. at 284-85, 84 S.Ct. at 728-29) (citations omitted) (emphasis added). We adhere to our conclusion that
 
 
 57
 this is a case where the record demonstrates that a properly instructed jury found liability, that clear and convincing evidence supports its verdict so far as liability is concerned, and that it was improper for the trial court to reweigh the jury's findings on credibility and arrive at a judgment n.o.v.
 
 
 58
 At 137.
 
 
 59
 The Petitions for Rehearing are, by the division, denied.
 
 
 60
 Order accordingly.
 
 
 61
 SKELLY WRIGHT, Circuit Judge, dissenting.
 
 
 62
 I dissented from the panel decision in Tavoulareas v. Piro, 759 F.2d 90 (1985). Since the full court has voted to vacate the panel decision and hear this case en banc, I believe it inappropriate to comment further on the merits at this time.
 
 
 63
 Before ROBINSON, Chief Judge, and WRIGHT, TAMM, WALD, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA and STARR, Circuit Judges.
 
 ON SUGGESTIONS FOR REHEARING EN BANC
 
 64
 PER CURIAM.
 
 
 65
 Appellees' suggestions for rehearing en banc have been circulated to the full Court. A majority of the judges in regular active service have voted in favor thereof. Accordingly, it is
 
 
 66
 ORDERED, by the Court en banc, that these cases will be reheard by the Court sitting en banc, and it is
 
 
 67
 FURTHER ORDERED, by the Court en banc, that this Court's Judgment and opinion of April 9, 1985, are vacated except to the extent they affirmed the judgment of the District Court notwithstanding the verdict in favor of appellee Sandy Golden. And, it is
 
 
 68
 FURTHER ORDERED, by the Court en banc, on its own motion, that the opinion of the panel majority on denial of the petition for panel rehearing, issued this date, be, and the same hereby is, vacated, and it is
 
 
 69
 FURTHER ORDERED, by the Court en banc, that the Clerk is directed to issue a partial mandate with respect to the portions of the opinion and judgment of April 9, 1985, affirming the judgment notwithstanding the verdict in favor of appellee Golden.
 
 
 70
 Counsel will be advised by a subsequent order of the future course of proceedings in these cases.
 
 
 71
 Circuit Judges TAMM and SCALIA would deny the suggestions for rehearing en banc.
 
 
 72
 Circuit Judge BORK did not participate in this order.
 
 
 
 *
 Opinion and judgment vacated. See p. 1481
 
 
 [1]
 Appellee Philip Piro petitions for rehearing and adopts the reasons stated in the Post's petition. Appellee Sandy Golden states that he does not seek rehearing of the panel's affirmance of the judgment entered by the district court in his favor
 
 
 [2]
 Given that the Post placed primary reliance on Comnas, it comes as no surprise that the jury refused to credit statements attributed to him when not one word of his testimony was placed into the record
 
 
 [3]
 Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), cited by petitioners, struck down as undue interference with the editorial process a Florida statute granting political candidates a right to reply to editorials critical of them. The case is factually distinguishable and, in any event, inapposite in light of Herbert v. Lando, 441 U.S. 153, 168, 99 S.Ct. 1635, 1644, 60 L.Ed.2d 115 (1979) ("[i]t is incredible to believe that the Court in Columbia Broadcasting System [412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) ] or in Tornillo silently effected a substantial contraction of the rights preserved to defamation plaintiffs in Sullivan, Butts, and like cases")